W. E. BROADNAX et als. v. WILEY BAKER et als.

*Ferry—Damages—Highway—Navigable Stream—Penalty.*

1. The franchise of keeping a public ferry is so incident to riparian ownership, that it can be granted to none but those who own the land at one of the termini, unless such proprietor refuse to exercise it, when it may be granted to another, upon his making compensation to the owner, and this is so, even when the termini are public roads.

2. Every subtraction from the profits of a ferry, by conveying its customers over the stream, with or without charge, is an injury for which an action will lie.

3. In such case, it is the diminution in the number of customers who would use the ferry, and the consequent reduction of tolls, which is the measure of damages recoverable against such wrong-doer.

4. The essential elements of a ferry franchise, is the exclusive right to transport persons, with the horses and vehicles and such personal goods as accompany them, from one shore to the other.

5. A public ferry is protected by the statute, The Code, §2049, from all interference with the proper enjoyment and use of the franchise by the erection of another ferry.

6. Navigable waters, constituted as highways, are not ascertained here as in England, by the extent of the ebb and flow of the tide, but for their capacity for floating boats used as instruments of commerce.

7. Such waters do not lose their character as navigable, because interrupted by falls, if they can be used for the purposes of commerce both above and below.

8. The essential idea in a ferry, is the crossing of a stream or other body of water from shore to shore.

9. The public have the right to the use of navigable streams, which are used as highways, in passing up and down it, from one point to another.

10. A court of equity will never enforce a penalty, although it be imposed by a statute, and a party who seeks relief in a court of equity in a case for which the statute has provided a penalty, must seek only his actual damage.

11. Where the plaintiff granted a ferry franchise from two points, opposite each other, on a large stream, *it was held*, that he could not enjoin and recover damages from a party who used the stream as a highway in conveying freight from points up the river, although one of these points was within the statutory distance of five miles.

(*Pipkin* v. *Wynne*, 2 Dev., 402; *Taylor* v. *The Railroad Co.*, 4 Jones, 277; *McRee* v. *The Railroad*, 2 Jones, 186; *Washington Toll Bridge* v. *Commissioners*, 81 N. C., 491; *Lewis* v. *Keeling*, 1 Jones 299, cited and approved).

Motion to continue a restraining order to the hearing, in a case pending in the Superior Court of NORTHAMPTON county, heard by *Phillips, Judge,* at Chambers in Jackson, on October 16th, 1885.

The plaintiffs, W. E. Broadnax and E. W. Wilkins, the other plaintiff being their lessee, are the owners of a ferry, which for more than fifty years has been operated by their ancestors and themselves across the Roanoke river at Gaston, between its opposite banks in Halifax and Northampton counties, terminating at public roads in each. It is recognized as such, and the tolls are regulated by the county authorities. The Roanoke is a large stream, navigable for more than forty miles above Gaston by boats of light draught, but obstructed below by a rock bottom, projecting towards the surface, over which the waters rush and fall in rapid descent, until at Weldon 12 miles below, they become smooth and quiet, and are again navigable.

The defendants own batteaux, which are propelled by poles up and down the river, and are employed in conveying freight, from a point near the ware house of the Raleigh and Gaston Railroad Company, a short distance below the ferry landing, on the south bank of the river, receiving and delivering such freight at various landing places above, for forty miles in this State, and in Virginia, some fourteen or more, for the transportation of which they make charges and receive compensation.

All the points on the river, touched by the boats for transportation purposes, are more than five miles above the ferry, except one, known as Mason's Landing, which is distant about two miles, and the defendants' business consists mainly in conveying supplies, brought on the railroad for farmers and other residents near the river, and farm products received for delivering to the said road, for further transportation to markets on the seaboard. The testimony is abundant, to the convenience of the defendants' line by water, and to the burden of land transportation by wagons, to any other accessible point of communication with railroads. The boats of defendants make trips up and down the river, from two times a week, to a less number, according to the distance

they have to go, and the amount of freight to be carried.    These batteaux draw, when loaded, eighteen inches of water, and have capacity for twenty bales of cotton of four hundred and fifty pounds each.

Voluminous evidence, in the form of affidavits, was read before the Judge upon the hearing of the plaintiffs' application for a restraining order, to operate until the trial of the cause, as to the effect of the defendants' line of transportation, in subtracting from the tolls of the ferry, and as to how much of the freight, but for its interference, would have found its way to the railroad over the ferry, and was in consequence lost.    There was formerly a railroad, connecting with the Raleigh and Gaston Railroad at Gaston, and leading thence towards Petersburg, at its junction with the Petersburg and Roanoke Railroad, but it has for many years been discontinued.    Upon the hearing of the plaintiffs' motion, the Court granted an injunction against the defendants' operating between the starting point and Mason's Landing, or any other landing place within five miles of the ferry.

From this order the defendants appeal to this Court.

*Mr. C. M. Busbee*, for the plaintiffs.
*Mr. W. H. Day*, for the defendants.

SMITH, C. J. (after stating the facts).    The franchise of keeping a public ferry, and demanding toll for transportation, resides in the State, and is so incident to riparian ownership, that it can be granted to none others than those who own the land at one or the other of its terminal connections, unless such proprietor or proprietors refuse to exercise it; when it may be conferred upon another, who can only obtain the right to use the soil for the purpose, by making compensation, and this even when those termini are public roads.    *Pipkin* v. *Wynn*, 2 Dev., 402.    This right to demand tolls in operating a ferry, sanctioned by the county authorities, with whom the power to establish it is depos-

ited, exists at the common law, and every subtraction from its profits, by carrying its customers over the stream, for or without charge, is an injury for which an action will lie. It is the diminution in the number of customers that would use the ferry, but for the interference, and reduction of tolls, which measure the damages recoverable against the wrong doer. So, by the common law, it was necessary to show "that the termini of the plaintiff's ferry were between the points of such person's departure and destination, as were in his route, and would have been passed by him, but for the defendant's wrongful interference." PEARSON, Judge, in *Taylor* v. *W. & M. R. R. Co.*, 4 Jones, 277.

To remove difficulties in the way of proofs, the General Assembly passed an Act by which it is provided, that if any unauthorized person shall pretend to keep a ferry, or to transport for pay *any person or his effects* within ten miles, reduced to five by the amendatory Act of March 12, 1883, ch. 381, of any ferry (being on the same river or water), which is already, or hereafter shall be, appointed, such person so pretending to keep a ferry, or transporting any person or persons or their effects, shall forfeit and pay the sum of two dollars for every such offence, to the nearest ferryman." Revised Code, ch. 104, §31.

Substantially the same enactment is contained in The Code, §2049.

The essential element involved in a ferry franchise, is the exclusive right to transport persons, and horses and vehicles with which they travel, as well as such personal goods as accompany them, from one shore to the other, over the intervening water, for the toll.

A public ferry, then, says ABINGER, C. B., in *Hussey* v. *Field*, 2 C. M. and R. (Exch.), 432, is a public highway of a special description, and its termini must be in places where the public have rights, as towns or vills, or highways leading to towns or vills." An invasion of this exclusive right, is not only restrained by the statutory prohibition against the erection and operation of another ferry, but the transportation for pay, of persons or their

effects, that is, as we understand the latter word, the accompanying personal goods under their direct control, is forbidden within the prescribed distance above and below.    The establishing of a new competing ferry, is absolutely disallowed, while other methods of transportation become penal, only when compensation is charged.

The defendants, according to the plaintiff's own showing, convey no persons for toll, and charge only for freight carried up and down the river, between the railroad and the numerous landings above, some even in the State of Virginia.    They in no proper sense maintain a ferry, nor is their business of the same nature, even assuming the plaintiff's exclusive franchise to extend to and embrace the carriage of freight, as such, and as a separate and independent article of commerce.    The defendants exercise the common right to use a navigable water, which unites two States, without the special concession of the State or county authorities.

"It does not follow," we quote again from the opinion of Lord Abinger, "from this doctrine," (the right of a ferry proprietor to be protected against an unlawful interference with his franchise by near and competing ferries), "that if there be a river passing by several towns or places, the existence of a franchise of a ferry over it, from a certain point on one side to a point on the other, precludes the King's subjects from the use of the river, *as a public highway*, from or to all the towns or places upon its banks, and obliges them upon all occasions, to their own inconvenience, to pass from one terminus of the ferry to the other."

Not unlike language is used by the Supreme Court of the United States, Swayne, Justice, delivering the opinion, in the elaborately argued and well considered case of *Conway* v. *Taylor*, 1 Black 603.    There, a ferry franchise was possessed by a riparian proprietor on the Kentucky shore, to run a ferry across the Ohio river at Newport, and in that State, as here, there were statutory prohibitions against the establishment of other ferries within one and a half miles over that river, and within a mile

upon any other stream, nor was any new ferry to be granted within a city or town, unless required ·by an accumulation of business, to which the afforded facilities were inadequate. In reference to the rights acquired under the authority of Kentucky, to run the ferry and transport thence to the opposite river bank in Ohio, without the correlative right to do this from the latter shore, the Court say:

"Those rights give them no monopoly, under all circumstances, of all commercial transportation from the Kentucky shore. They have no right to exclude or restrain those then prosecuting the business of commerce, in good faith, without the regularity or purposes of ferry trips, and seeking in no wise to interfere with the enjoyment of their franchise."

In *McRee* v. *W. & R. R. Co.*, 2 Jones, 186, the colonial legislature authorized the construction of a bridge over the North East branch of the Cape Fear river, and forbade the keeping of any ferry, or the building of any bridge, or the setting any person or persons, carriages, cattle, hogs or sheep, over the river for fee or reward, within six miles of its location. The charter of the defendant company authorized the construction of a railroad over the tract of country which made necessary a pass-way over the river, and within the six miles mentioned. The action was for the penalty given for a violation of this conferred privilege, and the Court held, that if a construction was to be put upon the enactment, which would arrest all improved future modes of transportation, demanded by increased wealth, population and business, the monopoly would be in antagonism to fundamental principles, and "contrary to the genius of a free State." Bill of Rights, §§22 and 23; *Washington Toll Bridge˙ Co.* v. ·*Commissioners*, 81 N. C., 491.

But the defendants are in the exercise of a common and undelegated right, to use the waters of a navigable river as a highway, in the carriage of goods, not primarily in the crossing, as a ferry is operated, from shore to shore, and between fixed landing places, but up and down the stream, there being a single

stopping place within the prescribed limits.   The right to use navigable waters, is superior to any incident to the ownership of the shores, and this, even when enlarged by the grant of an exclusive ferry or other franchise annexed to them.   *Lewis* v. *Keeling*, 1 Jones, 299.

Navigable waters, constituting highways, are not ascertained here, as they are in England, an island accessible to ocean tides, by the extent of their ebb and flow, but by a more practical test of their capacity to float boats used as instruments of commerce, in the interchange of commodities, and large enough for the purpose.   Such waters lose not their navigibility, because intercepted by falls, when above and below them, the waters can be thus used for the purpose of commerce for long distances. Under such circumstances, they remain highways for common use.   Such is the condition of many of our large rivers, and was of the Ohio itself, near the city of Louisville, until the impediment was overcome by works erected there.

The defendants' boats, with capacity to transport twenty bales of cotton, or 9,000 pounds of freight each, ascend and descend the river for more than forty miles, passing the State boundary, and as a common carrier, receiving and delivering goods at places along the route, and thus transferring the products of the farm to the railroad, and meanwhile, bringing supplies to the farmers, touching at a single point in the prescribed distance, and this point two miles further up the river.

Can the maintenance of such a line of transportation, be deemed an exercise of rights, intended to be inhibited by the restraining statute?   Is it in any proper sense, an invasion of the plaintiffs' franchise?   Does the statute mean to deny the facilities possessed by those who find Mason's landing a convenient point of shipment, and compel them to carry, by wheels, what they may raise, over the needless space of two or more miles to the plaintiffs' ferry, in order that they may have the tolls for ferrying it over?   We do not so interpret the prohibitory legislation.   The essential element in a ferry, is the transportation over interrupting water—a crossing from shore to

shore, at points conveniently opposite, and forming connection with thoroughfares at each terminus. A ferrry is defined by Mr. Webster, in words borrowed from legal authorities, to be, "a liberty to have a boat for passage upon a river, for the carriage of horses and men for a reasonable toll," adding, "It is usually to cross a large river." Tomlin's Law Dict.

It has now a wider application, and has been sometimes used to designate transportation over a wide expanse of water, the essential idea of passing from *one shore to an opposite shore* being retained.

We are not disposed to hold, upon the evidence, and with the defendant's denial that they carry any person in their boats for fee or reward, that they are invading the franchise possessed by the plaintiffs, or any just right derived under it.

The action, moreover, is not alone for remuneration for loss, in damages, but for the recovery of penalties for multiplied alleged offences, and the aid of the Court is sought as an ancillary remedy. But a court of equity leaves one pursuing this course, to his strict legal rights, and withholds its aid. One seeking equity, must do equity, and be content with full indemnity for actual loss sustained. Thus, a debtor charged with usurious interest, will be, as a condition of relief, required to pay the debt he owes, with legal interest, or if the bill be filed by the creditor, he must forego his demand for the penalty, and be satisfied with such compensation as measures his loss, or is the just amount of his claim.

"It is against the general principles of equity," remarks Story, "to aid in the enforcement of penalties or forfeitures." 2 Story Eq. Jur., §§1319 and 1494.

This rule of action is not abrogated by the union in one tribunal of the functions formerly divided between two, while each exercise those peculiar to itself, but the underlying principles of action are the same and unchanged.

There is error in the ruling, and this will be certified to the Court below.

Error.                                        Reversed.