COMMISSIONERS OF BURKE COUNTY v. CATAWBA LUMBER COMPANY.

*Floatable Streams, What Constitutes—Easement—Riparian Owners.*

1. Floatable rivers are navigable highways, in which the public has an easement paramount to the rights of riparian owners; and, in order to establish such easement, it is unnecessary to show that the river is susceptible of use continuously during the whole year, but it is sufficient if it appear that business men may calculate that, with tolerable regularity as to seasons, the water will rise and remain at such height as will enable them to make it profitable as a highway for transporting logs to mills or markets lower down. (Affirming *Commissioner's v. Lumber Company,* 115 N. C., 590.)

2. Between a point on the river where defendant's mill was located and the place where logs were cut for transportation thereto were shoals where the water was not deep enough to permit the passage of logs, but 8 or 10 times a year, at irregular intervals, the river rose several feet, remaining at such height from 24 to 48 hours, during which time logs were carried over the shoals without artificial assistance. *Held,* that the river was a floatable stream, in which the public had an easement, the reasonable use of which was paramount to the rights of the riparian owners. (Overruling *Commissioners v. Lumber Company,* 115 N. C., 590.) FURCHES, J., *dissents, arguendo.*

PETITION to rehear case decided at September Term, 1894, and reported in 115 N. C., 590.

*Messrs. Moore & Moore, I. T. Avery* and *C. M. Busbee,* for petitioner.

*Messrs. S. J. Ervin, J. T. Perkins* and *Burwell, Walker & Cansler, contra.*

AVERY, J.:   It seems to be settled law in North Carolina, as in all of the States, that navigable streams of every class, however defined or distinguished from other water courses, are natural highways, and that the public easement, whatever may be its extent, is paramount to the private right of the riparian proprietor. *State* v. *Narrows Island Club* 100 N. C., 477; *State* v. *Glen,* 7 Jones, pp. 321 & 327; *Broadnax* v. *Baker,* 94 N. C., 675; Gould on Waters (2nd Ed.) Sects. 86, 87, 107, 108 and 110; Angell on Water Courses, 541 a; 16 Am. & Eng. Enc., p. 236; *Sullivan* v. *Jernigan,* 21 Fla., 264.   All waters, including bays, inlets, rivers and creeks, "which are navigated by sea vessels," said the Court in *State* v. *Glen, supra,* at p. 323, "are called *navigable in a technical sense,* are altogether *publici juris* and the soil under them cannot be entered and a grant taken out under the entry law.   When the tide ebbs and flows, the shore between the high and low water may be the subject of direct, special, legislative grant.   *Ward* v. *Willis,* 6 Jones, 183"; *Bond* v. *Wool,* 107 N. C., 139.   The Court in that case went on to say that the beds of other streams were "technically styled navigable" and were open for appropriation by individuals by means of grants from the State.

In order to direct the attention more closely to the development of the principles governing the case at bar by a line of decisions in this State, and especially to controvert the contention of counsel that owners of the beds of inland rivers, not navigable for vessels, have the absolute control of the streams, we reproduce the following from the opinion

COMMISSIONERS *v.* LUMBER COMPANY.

of MERRIMON, J., in *State* v. *Narrows Island Club, supra,* "The learned counsel for the appellant pressed upon our attention *State* v. *Glen,* 7 Jones, 321, as an authority, favoring strongly the absolute right of the owner of the whole bed of the river. This is certainly a misapprehension of the real meaning of that case. The river to which it referred was ascertained to be unnavigable and the case does not contradict what we have here said. Indeed the Court recognized the public right in case of the navigability of the stream. It said : 'As the riparian proprietor of the land on both sides of the stream, he is clearly entited to the soil entirely across the river, subject to an easement in the public for the purpose of transportation of flour and other articles in flats and canoes.' It appeared that flat boats were occasionally used in transporting the articles named."

It still remained for this Court, when the forests of the State began to attract attention and to invite capital to, utilize them in commerce, to determine in precisely what classes of streams not technically navigable, the easement, which was paramount to the right of the actual owner of the bed of the river or of the riparian proprietor on both sides, existed.

In *McLaughlin* v. *M'f'g Co.,* 100 N. C., 108, this Court, adopting the classification of streams laid down by Wood in his work on Nuisances, 2nd Ed., Sec. 457, *et seq,* defined a navigable stream of the third class to be one which is "floatable or capable of valuable use in bearing the products of the mines, forests and tillage of the country it traverses to mills or markets." That case was cited and approved subsequently in the case of *State* v. *Corporation,* 111 N. C., 661.

In the dissenting opinion (which was written before the opinion of the Court) in *Gwaltney* v. *Land Co.,* 111 N. C., at p. 547, will be found a definition of a floatable

stream, which was adopted by the Court (see p. 552) and which 'has been since reiterated with approval in *Gwaltney* v. *Land Co.*, 115 N. C., 581, and in *Commissioners* v. *Lumber Co.* (the case now before us for rehearing) 115 N. C., 590. The language so often approved is as follows: "It is not necessary in order to establish the easement in a river to show that it is susceptible of use continuously during the whole year for the purpose of floatage, but it is sufficient if it appear that business men may calculate that, with tolerable regularity as to seasons, the water will rise to and remain at such a height as will enable them to make it profitable to use as a highway for transporting logs to mills or markets lower down." Justice MacRae, in *Gwaltney* v. *Land Co.*, *supra*, quoting further from the same opinion, says, "When prudent business men may regulate their expenditures with reference to the anticipated rise, the stream becomes a factor in conducting the commerce of the country."

In the former opinion in this case the Court laid down as a further test of floatability, the rule that "A temporary rise passing quickly down, is not sufficient to make a stream floatable and would not be sufficient, if the freshet should continue up for even two or three days and be reasonably expected every year. The increase in the depth of the streams occasioned by the rain-fall sufficient to float logs, occurs eight or ten times each year, and the water subsides in 24 or forty-eight hours. We are of the opinion that this floatability on the occasional and tolerably regular rises of the river must depend on more than a rapid freshet, subsiding as rapidly."

The first question raised by the petition and order granting the rehearing is whether the two rules laid down as *criteria* for determining the capacity of streams to subserve the purpose of channels of commerce are not so inconsis-

tent that both cannot be allowed to stand as guides to the people, who are anxious to understand and observe the law, as well as to the profession, whose office it is to advise them. If a stream rises to a sufficient height eight or ten times a year to carry down all the logs that have been rolled into it, may it not be possible that prudent business men would calculate with reasonable certainty on and regulate their expenditures with reference to an anticipated rise that will make the use of the stream as a highway profitable, notwithstanding the fact that it continues for only two or three days or even a shorter time? The capacity to carry logs from the place, when they are shipped upon it, and deliver them at the point where they are taken out for use, depends chiefly upon the velocity of the stream and the distance they are transported. Courts are not required to so restrict the limit to which judicial knowledge extends as to exclude matters which are of common observation and within the knowledge of all intelligent men. *Deans v. Railroad*, 107 N. C., 693. If a stream should carry a log at a velocity of three miles an hour, then in three days or 72 hours it would be transported a distance of 216 miles, in two days 144 miles, in one day 72 miles. It may be that the longest distance for which the Catawba River is used is not 72 miles and that Johns River is not used for more than half that distance. If all the logs awaiting removal on the banks of each stream were removed only ten times a year but at irregular intervals extending over the nine fall, winter and spring months, it is not impossible, indeed it is almost certain that any prudent business man could arrange to get all the logs needed in ten deliveries. Yet it is probable that all are delivered more than fifty times instead of ten.

How can we arbitrarily fix a minimum period for transportation and at the same time leave the capacity for yield-

ing a reasonably certain profit, as a test of floatability?
If it may be true that all logs placed alone in either stream
would be delivered at the mills of defendant from 27 to 63
times or oftener in the course of a year, how can we hold
that the rises must occur more frequently or continue
longer and leave people who wish to know and obey the
law in such a state of doubt and uncertainty that they
would be deterred without further information from engag-
ing in this important branch of commerce? The rule
which makes susceptibility to use, as a channel for trans-
porting the products of mines and forests, the criterion of
floatability, is a test which any intelligent lumberman can
comprehend and apply. The other criterion, which with-
out regard to the probable profits of the business or the
actual condition of the stream, would exclude from the
benefits of a water-highway · one who locates his plant
·on a swift ,mountain water course, which subsides within
two or three days and extend the .easement in a sluggish
stream to another person, if he settles in the low country,
though the water may land as many logs for the one in one
day as for the other in four days, is manifestly arbitrary
and inconsistent with the rule that has so often been sanc-
tioned not only by this Court in the cases we have cited
but approved by all of the leading text-writers and the
Courts of those States where extensive and valuable forests
have been or are being utilized. 1 Wood on Nuisances
(3rd Ed., Sec. 457) *Davis* v. *Winslow*, 51 Me., 264-290;
*Gaston* v. *Mace*, 33 West Va., 14; *Brown* v. *Chadburne*,
31 Am. Dec., 641; 59 Am. Dec., p. 22 & note; *Thunder
Bay Co.* v. *Speechly*, 31 Mich., 336; 6 Lawson R. & R.,
Sec. 2928.

Gould, in his work on Waters, Sections 108 and 109,
says: "It is not necessary that the stream, in order to be
a highway, should be capable of floating logs at all seasons

of the year, but its public character depends on its fitness to answer the wants of those whose business requires its use. If the stream is not always navigable it must be capable of floatage, as the result of natural causes, at periods recurring from year to year, and continuing for a sufficient length of time in each year to make it useful as a highway." Gould cites among other authorities the leading case of *Morgan* v. *King*, 35 N. Y., to sustain the foregoing proposition, and in view of the fact that the learned counsel for the plaintiff seemed to misconceive what the Court in that case meant by the words "in its natural state," it is perhaps best to call attention to the fact, that so far.from limiting the use of streams to the periods when they are not swollen from rainfall, the Court said ( at page 459 ), " Nor is it essential to the easement that the capacity of the stream, as above defined, should be continuous, or in other words, that its ordinary state at all seasons of the year should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes and occurring as regularly as the seasons, and if its periods of highwater or navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement." It is plain therefore that the text-writers, all of whom give their sanction to the doctrine of floatability as it has been approved by this Court, are warranted in citing *Morgan* v. *King*, as they do, to sustain their positions.

It will be observed that in almost every instance where we find the words, "in its natural state" quoted from *Morgan* v. *King* in the opinions of appellate Courts, the further discussion of the subject develops the fact that they are used in the sense given to them by the Court of New York. "Natural state" in that connection does not seem to have

116—47

been understood by Courts or text-writers as confining the
test of use for commercial purposes to the low water-mark
but as referring to the height attained as the result of the
regularly recurring rain falls of every year, which is a nat-
ural cause operating with some degree of uniformity.
*Lewis* v. *Coffee County*, 77 Ala., 193; The Motello, 20 .
Wall., p. 441 ; 25 Am. Dec., p. 862 and note ; 59 Am. Dec.,
649 note.

The intention of the Courts seems to have been to limit
the right of navigation for logs to those streams made use-
ful by the ordinary rainfall as distinguished from such as
would only transport the logs after resorting to artificial
means, as by blasting out and deepening the channel or
putting in locks or dams with gates.  6 Lawson R. & R.,
Sec. 2924.  We see no reason for following to its logical
results the argument of the learned counsel for plaintiff
and taking this occasion to overrule the line of our deci-
sions which recognize and define easements for the purpose
of floatage.  We think that any rule which attempts to fix
a definite period of time during which a water course at
each recurring rise must remain at a sufficient height to
transport logs and to adopt that rule alike to long and to
short, to swift and to sluggish streams, is in conflict with
the general doctrine, which makes capacity for profitable
use the test and, if adhered to, would close for commercial
use many water courses that have all of the elements of
natural highways, under the general definition approved
by the Courts of this and other States containing valuable
forests.  To illustrate the inconsistency of applying the rule
which makes time the test, suppose that logs were floated
in Johns River for a distance of only twenty miles and in .
the Catawba for sixty miles and that the velocity of the
current in the former stream were six miles an hour, in the
latter three miles, would it require precisely the same length

of time necessarily to supply a mill with all of the logs it could saw by the one as by the other? Under a fundamental principle of our system every man is presumed to know and is therefore required to observe the law of the land, and no rule ought therefore to be laid down for the government of the people, unless its terms are, or are capable of being made so certain that they can be understood. Doubtless the instruction which was sustained in *Gwaltney* v. *Land Co.*, 115 N. C., 579, was intended to apply to extraordinary freshets, upon the recurrence of which prudent business men could not rely for the success of a milling enterprise, but which often do occur at some time during the year and are therefore not unexpected. Construed in any other sense it would establish a rule that would prove so inconsistent with the general proposition that has received our sanction and with the leading authorities that both could not be applied as tests in any conceivable case.

We are brought therefore to the consideration of the question whether the Judge below properly applied the correct definition of a floatable stream to the facts found by him in the case before us. The action is brought to restrain the defendants from floating logs down the Catawba and Johns Rivers, because when the water rises to a sufficient height to carry the logs over the shoals, they necessarily come in contact with and partially or totally destroy a low bridge across the Catawba and another across Johns River, on a highway in Burke, and a third bridge across the Catawba river, between Burke and Caldwell Counties, one half of which is under the official management of the plaintiffs. The defendants have been using both of these rivers above the two bridges in Burke County to transport logs to a point on the Catawba below all three of the bridges, where the mill of the defendant is located. At this mill

the defendants employed about 75 laborers and saw about 35000 feet of lumber a day and have invested between $250,000 and $350,000, in establishing the plant. The depth of the Catawba river at the bridge known as the Rocky Ford Bridge and Lovelady Bridge, when the water is at ordinary height averages two feet, but in some parts of it reaches four feet and is about 300 feet wide. The depth of Johns River at the bridge over that stream is about four feet and it is about 100 feet wide. There are shoals on the Catawba at intervals of about half a mile and on Johns River about one fourth of a mile apart, where the water is only from 8 to 12 inches deep at ordinary low water. Between the shoals when the water in either river is at ordinary low water-mark, logs will be carried by the current of both rivers but not over the shoals without taking out stones and resorting to other artificial helps. Both of these rivers rise eight or ten times a year to a height of from two to four feet above ordinary water and remain at that height from 24 to 48 hours during which period all of the logs placed in the channel of either will be carried over the shoals without obstruction. (See findings 8 & 9.) These rises occur in the Fall, Winter and Spring months, not at fixed periods but some time during nine months. Besides these rises about two freshets usually occur during every year when these rivers rise eight to fifteen feet above the low water-line.

Eliminating from this discussion the arbitrary rule prescribing a fixed period for the continuance of the rise, it seems very clear that the learned Judge, to whom both parties entrusted the trial of all issues of fact and law, was not in error in holding, upon the facts found by him from the testimony, that both the Catawba and the Johns Rivers were in contemplation of law floatable streams. If eight or ten times a year every log placed in either stream above

these bridges will be carried without hinderance or obstruction over the shoals to the defendant's mill lower down, then it inevitably follows that by cutting and placing logs upon the bank in the way described in the findings of the Judge (see findings) a sufficient number can be transported on these highways to supply the mills.   The reasonable expectation that it would be within its power every year to transport a sufficient number of logs to keep its mills in operation without resorting to artificial assistance at the shoals, justified its managers in establishing their business. If the Judge was correct in finding that these rises "occurring at irregular intervals" during the fall, winter and spring months, are sufficient to carry every log committed to either river over the shoals, then the principle involved here is not affected by the fact that instead of being so provident as to lay in its supplies at the proper seasons, the defendant had sometimes opened a channel at the shoals during the summer months for the passage of logs, though, as His Honor finds, the mill had been almost exclusively supplied by floatage.   The question is whether the company was warranted in calculating when its business was established, that these two highways could be utilized, legitimately to furnish it full supplies of raw material for its mill.   We think that the facts justified the heavy expenditure it has made in the reasonable expectation that the law would protect it in the proper use of these natural highways.   If these rivers are floatable they are natural highways in which the public have, as in other water-highways, an easement—the reasonable use of which is paramount to the rights of all others.   Gould, Sects. 87 to 91 & 107 to. 110 ; *Broadnax* v. *Baker, supra* ; Angell on Water Courses (7th. Ed.) Sec. 536 ; 16 Am. & Eng. Enc., pp. 269 & 270 & notes ; *Ibid* pp. 259 & 260 & notes ; *Gwaltney* v. *Land Co.*, 111 N. C., at p. 547.

Where a stream is navigable for any purpose it is generally a nuisance to obstruct it. Wood on Nuisances, Sec. 464; *State* v. *Dibble*, 4 Jones, 107; *State* v. *Parrott*, 71 N. C., 314; 6 Lawson R. & R., Sec. 2936; *State* v. *Harper*, 71 N. C., 314; *Lewis* v. *Keeling*, 1 Jones, 299; *Hettrick* v. *Page*, 82 N. C., 65; Elliott on Roads & Streets, p. 491 and note. This principle as a general rule applies to interference with the right of floatage just as to attempts to prevent the passage of vessels in streams affording sufficient channel for them. Wood, *supra*, Sec. 464. But the right of floatage must be exercised reasonably and with a due regard to the rights of riparian proprietors and the owners of the beds of fresh water streams, especially such as belong to the third class of navigable waters and are only used as highways for the purpose of transporting logs. The owners of the soil have a right to the reasonable use of the water as a power for propelling machinery and operating the various kinds of mills. While the right to an easement for floatage is superior to that of the proprietor of the soil, the law enforces the use of the dominant easement with due regard to the servient interest. A person using a stream as a highway for transporting logs as well as one in charge of a steamer plying on navigable water, is answerable for wanton injury in even removing a nuisance. *Gwaltney* v. *Land Co., supra; Lewis* v. *Keeling*, 1 Jones, 299.

The governing principle is that the right to the use of a water highway for the transportation of timber is subject to the maxim that we must so use our own as to avoid needless injury to another. The public have the paramount right of way in the public roads, yet that does not excuse one driving a carriage or wagon over it for needlessly injuring a person or even an animal, that is temporarily obstructing it. *Davies* v. *Mann*, 10 M. & W. (Ex.) 545. It remains for us to determine in each case, that may here-

after arise, what is culpable carelessness in the enjoyment of this easement.     We adhere to the announcement made by the Court in the opinion which we are now reviewing (115 N. C., 596, 597) that the right of floatage must "Be exercised with due care for the avoidance of injury to the interests of the riparian proprietors and the owners of the soil beneath the bed of the stream.     And on the other hand, it would seem that if these were floatable streams, in which the public has an easement for transportation, it would be the duty of the County Commissioners, certainly in the absence of express authority to the contrary, to so construct bridges on the highways as to permit the use of rivers for the purpose of floatage."     If the streams are highways, then bridges constructed over them so as, by interposing a barrier to floating logs every time the rivers rise sufficiently high to carry them over the shoals, to practically prevent their use by the public, are unlawful obstructions.     6 Lawson R. & R., Sec. 2936; *Kean* v. *Stetson*, 5 Pick., 492; *Charlestown* v. *Middlesex*, 3 Met., 202.     The case last cited was one where the County Commissioners acted under the authority of an act passed by the legislature of Massachusetts, empowering them especially to build the bridge, but not specifying its character, and Chief Justice SHAW, in a strong opinion, announced the principle that the County authorities were not warranted in so constructing the bridge as to obstruct the use of the stream as a highway.

The question of reconciling the conflicting claims of owners of the soil of the bed of the stream, who erect dams across floatable rivers for the purpose of operating mills, is not now before us.     The Legislature has made provision in certain cases for opening dams so as to permit the passage of logs floated over them to market (*The Code*, Sec. 3712) and in Chapter 56 of *The Code*, which contains this provision, County Commissioners are clothed with authority to

have streams cleaned out.    It would seem that these sections were passed entirely with reference to floatable streams because, without condemnation the Commissioners would have no right to enter upon and clean out the beds of streams which were not natural highways.

It seems that the low bridges constructed by the plaintiffs and their predecessors have been frequently destroyed during rises in the rivers by trees floating down, but within a few years past the injuries to them have generally been caused by logs that are being transported to the mills of the defendant company.    We cannot destroy a great natural right which affects people scattered over hundreds of square miles whose only prospect of disposing of valuable property is depending upon the use of water for transporting timber to market, in order to save a county the difference between the cost of bridges two or three feet above the low watermark and more durable structures above the high watermarks.    Perhaps it may not be improper to add that where a stream is not floatable it can be used for the transportation of logs only by a license from the owner of the bed of the stream or the riparian proprietor.    Without such license one who is using the stream for such a purpose is, either as a trespasser, responsible for at least nominal damages or, when he creates a nuisance, for any special damage shown to have been actually sustained.    It appears incidentally from the testimony that many tributaries of the Catawba other than Johns river, and of which the floatability is not in question here, have been used in some way by the defendant for transporting logs to the Catawba and thence to its mill.    This intimation may serve as a guide in regulating its conduct or in adjusting the rights of those interested. In reference to the argument that no sufficient ground had been shown for granting a rehearing, we need only say that the Court was not advertent, in its former opinion, to

the inconsistency of the two tests of floatability given in the same opinion. The question was not discussed in the opinion, and attention was not directly called to it on the argument.

On reviewing the rulings of the learned Judge who tried the case below we find no error and are of the opinion that the judgment should have been affirmed. To the end that it may be now enforced let this opinion be certified to the Court below.

Petition Allowed.

FURCHES, J. (dissenting) : Dissenting from the judgment of the Court, I think it due alike to the Court and to myself that I should state some of the reasons I have for so doing.

The petition to rehear in my opinion is in violation of the rules of this Court. It does not only undertake to point out the error of the Court in its opinion as reported in 115 N. C., 590, but it enters into an extensive argument to sustain the petition. This is not allowable, as held by the Court in *White v. Jones*, 92 N. C., 388, where it is held that such arguments should not be made in the petition but on the argument in Court. As I understand the rule, interpreted by the Court, "No case should be reversed upon a petition to rehear unless it was decided hastily, and some material point was overlooked, or some direct authority was not called to the attention of the Court." *Watson v. Dodd*, 72 N. C., 240; *Hicks v. Skinner*, 71 N. C., 539 ; *Haywood v. Daves*, 81 N. C., 8; *Devereux v. Devereux, Ibid*, 12; *Smith v. Lyon*, 82 N. C., 2 ; *Lockhart v. Bell*, 90 N. C., 499 ; *University v. Harrison*, 93 N. C., 84; *Dupree v. Ins. Co., Ibid*, 237. "Where the grounds of error assigned in a petition to rehear are substantially the same as those argued and passed upon in the former hearing, the Court

will not disturb its judgment." *Lewis* v. *Rountree*, 81, N.
C., 20. "The weightiest considerations induce the Court to
adhere to its decisions unless manifest error appears, espe-
cially when the decision was made by a full Court and with
unanimity, and after full argument by counsel." *Lewis* v.
*Rountree, supra.* "The Court reiterates that it will
rehear a case only for weighty considerations and when
the alleged error clearly appears." *Emry* v. *Railroad*,
105 N. C., 45.

The matters of fact complained of by the petitioner are
"That it seems that the Court overlooked the findings of
*Judge Allen* that petitioner's mill had been established in
1890" and that *Judge Allen* found that both the rivers, at
the "points" where the bridges are, were floatable streams.
We do not admit these allegations. As we find that Jus-
tice AVERY in a concurring opinion starts out by saying:
"If it be true as appears from the testimony offered, and
was found by the Judge below, that neither the Catawba
River nor Johns River affords sufficient water to float logs
over the shoals that abound in the beds of both, except
when they rise suddenly 8 or 10 times every year, and con-
tinue at a sufficient height to carry logs off for a period of
from 24 to 48 hours, then neither of the rivers would fall
within the definition of a floatable highway, heretofore
given by this Court. *Gwaltney* v. *Lumber Co.*, 111 N. C.,
547." Then it would seem that not only the findings of
*Judge Allen* were fully considered by the Court, but the
evidence in the case as well. But suppose the Court did
not take into its consideration the fact that petitioner's mill
was established in 1890, can it be contended that the estab-
lishment of petitioner's mill changed the character of the
streams and made two rivers navigable that were not so
before? I cannot subscribe to any such doctrine. And sup-
pose these rivers are wide enough and deep enough at the

"points" where the plaintiff's bridges are, to *float a log* but for every quarter of a mile above and below in Johns River, and every half mile above and below in the Catawba River, there are shoals and rocks, as is found by *Judge Allen,* so shallow and rough that a log will not float over them, except when the water is up—from 8 to 10 times a year. What difference could this make in determining whether these rivers were navigable or not? What good could it do the petitioner to float his logs under the bridge if he could not get them down the river? So it is perfectly apparent to me that there is nothing in these assignments, if it should be true that they were not considered by the Court. And this I do not admit.

Then the only remaining question to be considered is the question of law argued, rather than stated, in the petition, that the Court erred in construing the word "usually" in *Judge Allen's* finding. The petition then shows that this part of the Judge's findings was not overlooked by the Court. And that the petition should not be allowed, and the opinion rendered at the last Term of the Court over-ruled on this ground, see *Dupree* v. *Ins. Co.,* and other cases cited, *supra.*

This is a rehearing. The facts are just now what they were at the last Term of the Court. Not a word has been added and not a word taken away. It is admitted in the petition that they were considered and the opinion of the Court shows they were, as one of the opinions filed says the facts found by the Judge and shown by the evidence established the fact that this river is not even *a floatable river.* It is not shown that the case was not well argued at the last Term, or that it was hastily determined. Indeed the case as published forbids any such conclusion, as there is not only a leading opinion by Justice MACRAE, but a lengthly concurring opinion by Justice AVERY. The opin-

ion at last Term was unanimous—no dissenting voice. It is shown there were no mistakes of fact at that Term that could possibly affect the opinion of the Court. So the question comes substantially to this; that this case is an appeal from the last Term of this Court to the present Term. And the result is that four Justices at this Term hold that the Judgment of five Justices at the last Term was erroneous.

I have thus far been considering the case upon the rules and practice established, as I think, by a train of authorities, some of which I have cited, to show that this petition should not be allowed.

And as my opinion is not to be the law that governs the case, I will not enter into an elaborate discussion of the question as to whether this river is a navigable, a "floatable", stream or not. But in my opinion the doctrine announced in the opinion of the Court reverses what has been considered the law in this State for more than a hundred years. I had supposed until recently that what was *naturally* a navigable water course was settled in this State. The idea has been, and this State has acted upon that idea from its organization until now, that it has no right to grant the beds of navigable water courses, but that it had the right to grant the beds of such as were not navigable. And acting upon this idea, the State has granted the soil under the water in most of the water courses in the Western part of the State—such as the Catawba River, Johns River, Yadkin River, &c. *State* v. *Glen*, 7 Jones, 321. These rivers are not like they are in the Eastern part of the State. There, where a river is wide enough for navigation, it is deep enough. But the rivers in the Western part of the State, such as the Catawba, the Johns and the Yadkin, are broad, shallow, rapid, and full of shoals and rocks, and valuable principally for water power which abounds all

through that section of the State. Many of the citizens who wish to erect mills and for the purpose of not being troubled about their dams, have entered or bought of others that had entered the beds of these streams, erected their dams thereon, attached thereto their mills and machinery. They are the owners of this property. But the effect of this opinion is to legislate them out of their property, their vested rights, without process or compensation. The idea that the Catawba and Johns Rivers are navigable water courses is one of recent origin. It has been held that the *Yadkin was not*—*was*, because it probably is now, under this decision. In *State* v. *Glen, supra*, which is reiterated by this Court through Chief Justice MERRIMON in the case of *State* v. *Narrows Island*, 100 N. C., 482, it is held not to be navigable. And the Yadkin River is longer and much narrower a navigable water course than are the Catawba and Johns Rivers.

But under the definition laid down in this case, the question will be, what is not a navigable water course? There are thousands of little streams in the West that will float a log ( and how many are to be floated to make it navigable, we are not told ) when up. They, like the Catawba and Johns, rise when it rains, and can be counted on to rise with about as much certainty as either of these streams. Then, why are they not also navigable? Where is it to end? And where is the line to be drawn between what is and what is not a navigable stream? Whose property will be safe against an interested lumber company or lumber speculator? Our rivers in the Western part of the State are not like the rivers in the North West, the source from which the Court draws its authority for declaring these streams navigable water courses. They are more like our eastern rivers. Their seasons are different from ours. They rise at regular periods, and continue so for the season,

COMMISSIONERS *v.* LUMBER COMPANY.

and I prefer to adhere to our own authorities and State policy rather than to these Northern authorities that reached us about the time such parties began to speculate in our timbers.

"Floatable water courses" is a term not known to our law, until within the last six or eight years, and, as I say, came about the time the lumber speculators came, who, as I understand and as seems to be urged in this case, have bought up large sections of woodland, and the Court must protect them.

With me, this has nothing to do with my judgment in this case. I cannot see how large bodies of timbered land, as urged in the opinion of the Court, can make a river navigable which was not navigable before. It may be a convenience to those having such timber to have a navigable water course. But how the fact of having timber can create the navigable condition of the water course, I cannot see. I cannot help looking at this case as a contest between the parties for legal rights and not one of policy. If these rivers are navigable water courses, the plaintiffs are trespassers and are guilty of creating and maintaining a public nuisance, though they are only doing what had been conceded to their ancestors and predecessors for a hundred years. But if the North Carolina idea should be sustained, that is, if these streams are not navigable water courses, then the petitioners in destroying plaintiff's bridges are trespassers. If the plaintiffs are trespassers, every mill owner and fishery owner, who thought he was owner of the soil upon which his dam is erected, is guilty of creating and maintaining a public nuisance.

The Court says the legislature could make provision for slopes, or in some other way protect such persons. If there is to be legislation, I think it ought to be *by the legislature* in declaring and providing for making that a public

highway which, nature has failed to make so, in which there would be provision made to compensate the property owners for their property taken for the public use—as in cases of railroads, canals and other public improvements. That is within the province of the *legislature* and not within that of the Courts.