GEORGE N. HUTTON *et al.* v. THOMAS M. WEBB, Sheriff, and
THE BOARD OF COMMISSIONERS OF BURKE COUNTY.

(Decided June 14, 1900.)

*Floatable Streams—Assessments, Act 1897, Chapter 388—
Riparian Owners.*

PETITION TO REHEAR.

1. The opinion filed in this cause, reported in 124 N. C., 749, is
   adhered to.
2. The Act of 1897, chap. 388, does not affect the principle that the
   right of floatage in the public is superior to any right of
   riparian proprietors, but attempts to deprive both the public
   and the riparian owners of their free right of floatage without
   compensation to either.
3. While the right of the State, directly or through proper agencies,
   is admitted, to improve the stream whenever it sees fit to do
   so, and to charge a just equivalent for the benefit enjoyed as
   the result of such improvement, by the imposition of tolls or
   property tax, the opinion not only recognizes the right of float-
   age, but protects that right against the encroachment of the
   State.

Petition dismissed.

DOUGLAS, J., writes the opinion.
CLARK and MONTGOMERY, JJ., write dissenting opinions.

*Messrs. A. C. Avery,* and *J. M. Mull,* for petitioners.
*Messrs. E. B. Cline,* and *Shepherd & Busbee, contra.*

DOUGLAS, J.   This is a petition to rehear the case as re-
ported in 124 N. C., 749. The difficulties of the case
apparently arise from the fact that the concurring opinion,
which under the otherwise even division of opinion had the

peculiar effect of controlling the judgment of the Court, did
not fully concur in its opinion.    The case as presented to us,
did not involve the abstract right of the State to improve its
floatable and navigable streams, and to charge such tolls as
would fairly represent their increased value as public high-
ways to those who had received the benefit of such improve-
ment, but simply the right of the State to deprive the plaintiff
of the use of his natural easement without some correspond-
ing benefit in the nature of compensation.    The dominating
principle apparently controlling the judgment of the Court
is thus expressed in the concurring opinion on page 759:
"The term 'floatable stream' implies an easement in some one
to use the stream for purposes of transportation.    Whether
this easement belongs to the general public or is appurtenant
to the riparian lands, it is difficult to say.    If it exists at all,
it must belong to the riparian owner, as a *natural* easement.
Whether it vests in him solely or in common with others, it
is needless now to discuss.    If it is worth anything to any-
body, it is a valuable appurtenance to his land, of which he
can not be deprived without adequate compensation. Whether
this compensation must be in money, or may be in the in-
creased conveniences afforded him by reasonable improve-
ments upon the stream, need not now be considered, as no
compensation whatever appears to have been given to him,
and no substantial improvements have been made which
would increase the facility of transportation.    I speak of the
riparian owners as a class, each of whom has the easement,
where it exists, as far as the floatability extends.    If he
owns the easement, then the State can not charge him with
the simple use of it.

"I concede the right of the State to establish a highway
on water or land.    *    *    *    I also admit that where the
State has made or caused to be made valuable improvements of

a local nature, it may charge a reasonable compensation for the use of the increased facilities and benefits afforded by such improvement. But this is in the nature of a toll and not a tax, and presupposes some corresponding benefit to him who pays the toll. Where there is an utter failure of consideration, why should the toll be paid? But it is said to be in the nature of a special tax levied upon the property to be benefitted. But on what property is it levied? Not on the logs, for they have not been benefitted, nor even assisted in their journey. Moreover, a tax must possess some element of uniformity, and, if levied locally for a special purpose, its disbursement must be confined to its creative objects." This we understand to be the general tenor of the opinion of the Court, which says, on page 751: "It is true that the Legislature may by proper enactment provide for the improvement of such waterway for the *benefit of navigation.* But the Legislature can not impose duties upon the commerce upon such waters for the purpose of 'building public bridges and of cleaning out fords, public and private, across' such watercourses." The plain meaning of this is that such duties, whose imposition upon commerce can be justified only by their reciprocal benefits, can not lawfully be diverted to a purpose, public or private, utterly foreign to their original object; nor can we give our approval to any law which permits such unjust diversion. As the purpose of a special tax or toll is the only justification for its imposition, it can not lawfully be imposed where such diversion is permitted. We presume that a city can impose general taxes for the improvement of its streets, even if the bulk of it is spent in some one locality. It seems equally true that it can levy special assessments in different localities for the purpose of making special improvements within those localities. This is permitted upon the principle that where money is spent for the benefit

of those who paid it, they are not injured, as the nature of
the improvement is supposed to be worth its cost.    But can a
city levy special taxes in one particular section to be spent in
an entirely different section?    Or can it impose a special
assessment upon one piece of property for the exclusive bene-
fit of another?    Surely not.    And yet this has been done in
the case at bar.    A heavy assessment has been levied on these
logs without any corresponding benefit to them or their owner.
No improvement has been made in the floatability of the
stream of which they have had any advantage.    At best, the
money which they paid would be devoted to the future im-
provement of the stream, even if none were used in building
bridges or cleaning out private fords.    Their owner may not
have any more logs to float down, and, if he did, he would
probably be called on to pay toll for the floatage.    This right
of floatage he already possessed, as we have held this to be a
floatable stream.    It did not come to him by grant from the
State, nor was it created by the decision of this Court.    All
that this Court did or could do, was to declare its existence
as a *natural* easement, the right inherent in the general pub-
lic to use a natural highway.    It was said that this right
belonged to the riparian owner, but it was not said that he
was its exclusive owner.    If it exists it certainly belongs to
him in some capacity, and to some extent.    If it is a local
highway, he is entitled to its use by virtue of his riparian
ownership, and if it is a public highway in its broadest sense,
he is equally entitled thereto as one of the general public.
This right can not be taken from him without just compensa-
tion in some form or other, and this is the essence of our
decision.

There seems to be an idea that an easement can exist in the
general public without belonging to the individual.    The gen-
eral public in such a sense is a pure abstraction.    As an

artificial entity, it can not use the highway, as it can neither ride nor walk, having neither feet nor hands. The easement is available only to the individual, and, if he has the right to use it, then he has the easement.

Again, it is suggested that the State owns the highway separate and apart from the individual, to whom it may forbid its use without any form of compensation. This is probably a survival of the old idea that the highways belonged to the King, in whom in fact was vested the ultimate fee to all land. While, for purposes of government we must still regard the State as an artificial entity apart from the individual citizen, and while certain kinds of property must be reserved by the State to be used in a certain manner and for certain specific purposes free from all private interference, yet after all the State is but the trustee for its people, and, within the necessary limitations of the trust, the privileges of the citizen are inherent and of common right. Thus the right of the individual to use the highway does not come from the permission of the State, but rests upon the primary object for which the highway was established—the use of the public. The power of the State to regulate the highway is an entirely different matter, but rests upon the same general principle—the ultimate welfare of the people. Suitable highways are absolutely necessary to all people, and the more free, intelligent and progressive a people become, the greater will be their demand for highways suitable to their development, and commensurate with their advancement. Such highways it is the duty of the State to establish, and with this duty go the corresponding powers necessary to its performance. Such powers, however, although ample and largely within the discretion of the legislative body, can not ignore the vested right of the citizen. Such rights on the other hand are not permitted to lie "in cold obstruction across the pathway" of the State,

but are subordinate to the paramount right of eminent domain. By condemnation with compensation, any right of property can be taken for a public purpose.

We do not deny the right of the State to improve floatable streams, including the one in question, and to regulate their use, even if it interferes with the natural easement hitherto enjoyed by the public.

When, however, one is deprived of his vested easement, which is the result *pro tanto* if he is made to pay for its use, he must be given some compensation in money or in kind. This compensation must be actual and present, and not merely speculative and prospective. Where the easement is in the nature of a toll, the benefit must be contemporaneous and reasonably co-extensive with the payment. When we say that the State can do this, we mean it can do so directly or by means of such agencies as it may deem best suited to accomplish its public purposes. We do not deny the power of the State to entrust such work to a private individual or corporation, nor the right of such private party to charge such reasonable tolls as would return a fair profit; but there may be some doubt whether public agencies would be entitled to any profit beyond the interest on the investment and the cost of maintenance, operation and repair. On this point we express no opinion, as it is not before us in our view of the case.

All that is now before us is the judgment of the Court below continuing until the trial of the action the injunction restraining the sheriff and tax collector "from proceeding in any way under the assessment against the plaintiffs mentioned in the pleadings, and also from interfering with the floatage of logs by the plaintiffs down said Catawba and Johns rivers by the assessment or imposition of toll; or the levying or collecting of any tax or toll on the property of the

plaintiffs, or by the sale of any property of the plaintiffs under any assessment or otherwise."

The learned counsel for the defendant is mistaken in supposing that we overlooked the case of *Commissioners v. Lumber Co.*, 116 N. C., 731, to which we presume he refers. That case was cited in the dissenting opinion, and referred to in the concurring opinion, but is not involved in the decision of this case. The act under consideration does not affect "the principle that the right of floatage in the public is superior to any right of riparian proprietors," but attempts to deprive both the public and the riparian owners of their free right of floatage without compensation to either. Nor do we deny "the power of the Legislature to provide for levying tolls or assessments for *keeping in order* public highways used for floatage."

"Keeping in order" implies that the highway has previously been put in order; that is, that substantial improvements have already been made, from which the user has derived a substantial benefit. In such cases, the toll is regarded as the equivalent of the benefit already received.

Our opinion not only recognizes the right of floatage as existing in the public, but protects that right against the encroachment of the State. At the same time, we admit the right of the State, directly or through proper agencies, to improve the stream whenever it sees fit to do so, and to charge a just equivalent for the benefit enjoyed as the result of such improvement.

Upon the facts of the case as presented to us, and the legal principles above set forth, we think the judgment should be affirmed. The petition to rehear is therefore dismissed.

Petition dismissed.

CLARK, J., dissenting. We are saved any discussion whether this is a floatable stream or not, for it was held in

*Commissioners v. Lumber Co.*, 116 N. C., 731, that the Catawba River, at that part of it which is embraced in the statute now before us, is a floatable stream. This Act (1897, chap. 388), recites that decision and provides for the regulation of the use of the stream for floatage purposes.

In *State v. Glenn*, 52 N. C., 321, it was held that floatable streams are *"public highways by water,"* like navigable streams, the only difference being that in floatable streams the bed of the stream is capable of grant to the riparian owners for such uses as will not conflict with the paramount public right to the use of the stream for floatage. The riparian owner, as such, can have no rights not common to all others, except over the bed of the stream, to the center, within his boundaries. He can have no possible rights, as riparian owner, above or below his line, for there the riparian rights of the other owners come in. Consequently, as riparian owner, he has no right whatever above or below his line to the use of the stream for floatage, any more than a land owner over whose land a toll road or canal or other highway runs. The riparian owner has rights of floatage but not as a riparian owner, and only as any other citizen has the right to the use of a public highway, and on the same terms as is granted to all others, whether that be free or on payment of toll. By the accident of location, a riparian owner may have greater need to use the stream for floatage or for navigation (when it is navigable) and greater ease of access. But anyone else, who can get his logs to the stream either by the use of public roads crossing the stream or by permission of some riparian owner to cross his land, when he places his logs in the stream, has the same right to use the stream. The stream being a *public highway (State v. Glenn)* he owes no duties or tolls to any riparian owner, and no riparian owner has any superior rights to his, any more than land owners adjacent to any

other public highway have superior rights to the use of the highway.

All public highways are alike in this, that their regulation and the terms on which they may be used rest with the people at large who express, and can express, their will only through their representatives in the Legislature, unless when some question is presented direct to them at the ballot box by what is now termed a referendum. Whether this or any highway shall be free, or whether tolls shall be paid, and, if so, what tolls, is a matter for the Legislature, not for the courts to decide. The riparian owner loses no property rights. He has none beyond his upper and lower lines, and to the thread of the stream, and within those limits he has the bed of the stream for such use as he can make of it, but subject to the superior right of the sovereign to the use and regulation of the stream for all its citizens alike.

The law-making power is confided by the Constitution to the General Assembly, and no act of theirs can be held invalid unless it plainly and palpably violates some provision of the State or Federal Constitution. No provision of either can be pointed out that restricts the power of the General Assembly to regulate the use of public highways or to exact tolls for the use of them. There is no requirement of either instrument that work must be done by the sovereign on public highways by water before tolls can be exacted, and that thereafter tolls can be exacted only to the precise amount of public funds so expended. Whether or not this would be a desirable restriction upon the power of the law-making body entrusted with general legislation, the people have not seen fit to place it in the Constitution, and no one else can place such restriction there.

The Supreme Court of the United States has uniformly held that the power of a State Legislature to regulate the

use of floatable streams and prescribe tolls upon logs, is unlimited by the United States Constitution, save when such stream lies in two States, and even then the lower State can place tolls upon logs between any two points in it, and also as well upon logs coming from a State higher up, unless Congress has legislated on the latter subject.   In a very recent decision in the United States, *Lindsay v. Mullen,* filed January 15, 1900, 20 Supreme Court Reporter, 325, is is said, speaking of the Manistee River: "The State can authorize any improvement which in its judgment will enhance its value as a means of transportation from one part of the State to another.   The internal commerce of a State—that is, the commerce wholly confined within its limits—is as much under its control as foreign or interstate commerce is under the control of the general government; and, to encourage the growth of this commerce, and render it safe, the States may provide for the removal of obstructions from their rivers and harbors and deepen their channels, and in other ways. * * * And to meet the cost of such improvements, the State may levy a general tax or lay a toll upon all who use the rivers and harbors as improved.   Regulation of tolls and charges in such cases are mere matters of administration under the entire control of the State."

What the improvements shall be, and what the rate of toll, whether the tolls shall be greater or less than the cost of the improvement, and whether the agency shall be directly by the State through special commissioners, or (as here) by the agency of the Boards of Commissioners of the riparian counties, or whether the agency shall be by means of chartered "navigation companies" or contractors (for all these methods have been tried), and whether the State shall raise a fund by tolls to be applied, when raised, to making the improvements, or shall first advance the necessary funds out

of money raised by general taxation, and further, if the tolls prove insufficient, whether the deficiency shall be made good out of the public treasury, or whether, if the tolls shall be more than sufficient, the surplus receipts (like the receipts of the Federal Government from port dues and the like) shall go into the general treasury, or whether such surplus shall go as directed by this act to building bridges over the stream to take the place of the fords deepened for floatage—all these matters rest with the representatives of a self-governing people, who, from time to time, will change the tolls and regulations as experience may dictate. There is no hint in the Constitution (State or Federal) that the General Assembly is restricted from legislating as to the regulations and tolls upon public highways by water; still less is there any indication that the wisdom of the courts is so far superior to the will of the people expressed through the law-making body that the judiciary shall *virtute officii* supervise and correct legislation, whether wise or unwise (in its estimation), when such legislation is enacted within the limits not forbidden to the General Assembly by the Constitution.

MONTGOMERY, J., dissents. He doubts the power of the General Assembly to enact that part of chap. 388, of the Acts of 1897, which has given rise to this litigation, but its unconstitutionality does not clearly appear to his mind, and therefore he does not concur in the opinion of the Court.