STATE v. SUTTON.

(Filed October 17, 1905).

*Fish and Fisheries — Mill Seat — Construction of Criminal Statutes.*

1. Under Chapter 824, Laws 1905, which provides that "it shall be unlawful for any person to hedge or fish with traps in the waters of Bear Creek between the mouth of said creek where it empties into Neuse River and the Joyner mill-seat," the defendant is prohibited from setting hedges in ditches 15 or 20 yards below the mill house, though he owns the mill house and the land for 75 yards below the mill, as "mill-seat" designates a well defined landmark—the dam and mill—and not the extent of the mill owner's territorial possession in the vicinity.

2. Under this statute, the defendant is not prohibited from setting hedges on the sheeting of the mill, under the roof of his mill house and catching fish coming out of the pond, but he cannot interfere by such hedges with those which come up from the mouth of Bear Creek till stopped at the dam and mill-seat.

3. A "mill-seat" means the mill house, dam and appurtenances used for operating the mill by water power, and the ground upon which they stand.

4. The right of the General Assembly to regulate fisheries, even on private property, is settled.

5. The rule that criminal statutes are to be strictly construed, applies when the scope of the act is doubtful and does not mean that a word is to be given a different meaning in a criminal action from that which would be given it in a civil proceeding.

CONNOR and HOKE, JJ., dissenting.

INDICTMENT under chapter 824 of the Acts of 1905, against A. R. Sutton, heard by *Judge W. B. Councill* and a jury, at the August Term, 1905, of the Superior Court of LENOIR County. From a judgment of guilty upon a special verdict, the defendant appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*Y. T. Ormond* and *Aycock & Daniels* for the defendant.

CLARK, C. J.    This action was begun before a justice of
the peace, and on appeal the defendant was again convicted
in the Superior Court for a violation of chapter 824, Laws
1905, which provides: "It shall be unlawful for any person
to hedge, or fish with traps in the waters of Bear Creek be-
tween the mouth of said creek where it empties into Neuse
River and the Joyner mill seat in Lenoir County."

The word "mill-seat" is synonymous with mill-site and
means "where the mill sits." *Miller v. Ins. Co.,* 7 Fed. Rep.,
651. In *Curtis v. Smith,* 35 Conn., 158, it is said: "A mill
site comprehends not only the site of the mill building, but
also the water power connected therewith for milling pur-
poses." The grant of a mill site conveys by implication the
water power and the right to maintain a dam for the bene-
ficial appropriation of the water. *Stackpole v. Curtis,* 32
Me., 383; *Ring v. Walker,* 87 Me., 550. In *Occum Co. v.
Mfg. Co.,* 35 Conn., 512, it is said: "A mill site is the same
as a mill privilege which, in *Gould v. Duck Co.,* 13 Gray
(Mass.), 442, was said "to embrace the right which the law
gives the owner to erect a mill thereon, and to hold up or let
out the water at the will of the occupant for the purpose of
operating the same in a reasonable manner."    20 A. & E.
Enc. (2nd Ed.), 675; *Crosby v. Bradbury,* 20 Me., 65; *Burr
v. Mills,* 21 Wend., 294.

A "mill seat" means the mill house, dam, and appurte-
nances used for operating the mill by water power, and the
ground upon which they stand.    The evident purpose of the
General Assembly in this statute was to keep the waters of
Bear Creek free from hedges or traps, so that fish might run
up the same as far as the obstruction caused by the dam and
water power at Joyner's mill, beyond which they could not
go.    The right to regulate fisheries, even on private property,

is settled beyond controversy, 2 Farnham on Waters, sections 381, 382; *Collins v. Benbury,* 25 N. C., 277; *State v. Gallop,* 126 N. C., 983, and cases there cited, and in 13 A. & E. Enc. (2nd Ed.), 573, 576, 579, and notes; *State v. Bridgers,* 142 Ill., 41; *State v. Roberts,* 59 N. H., 484; *Howes v. Grush,* 131 Mass., 207.

This case turns upon the meaning of the word "mill seat" which is to be taken in its ordinary and usual signification, which is necessarily the same in both criminal and civil proceedings. The rule that criminal statutes are to be strictly construed applies when the scope of the act is doubtful, and does not mean that a word is to be given a different meaning in a criminal action from that which would be given it in a civil proceeding. Words are used by the law-making power to express, not to conceal, its meaning, and hence are to be taken as ordinarily understood, alike in criminal and civil actions.

It is stated in the case on appeal that "many years ago, the original conveyance of this mill property conveyed about 20 acres of land for a mill seat, and that the property conveyed to the defendant includes about 20 acres of land, and extends about 75 yards below the mouths of the ditches," which were "15 or 20 yards below the mill house," and on both sides of the mill race. In these ditches and also on the sheeting of the mill, under the roof of the mill house, the defendant set wire fences or hedges, and caught fish. The latter were on the "mill seat" or site, as we understand and define the word, and defendant was authorized so to do. He is not prohibited to catch in this manner fish coming out of the pond, but he cannot interfere by such hedge with those which could come up from the mouth of Bear Creek till stopped at the dam and mill seat.

It is further contended, however, by the defendant that the hedges set "15 or 20 yards below the mill house" were lawful because the owner of the mill house also owned the land for

75 yards below the mill. Suppose he had owned a tract of 2,000 acres or 20,000 around the mill, would his privileges under this act have been any greater than those of a man who, owned only the "mill seat" itself? He had no inherent right of fishing in Bear Creek. That was a sovereign right of the State to be permitted or denied at the will of the sovereign, speaking, in the only way in which it could make known its will, through the law-making power. In forbidding the monopoly of fishing by hedges and traps and leaving fishing free to all, on Bear Creek, from its mouth to Joyner's mill seat, the Legislature was thinking of the unobstructed part of the creek up to Joyner's mill house and dam, and was regardless of the extent of dry land along the creek, between those points which might be owned by the owner of the "mill seat." By "mill seat" it intended to designate a well defined landmark, which all men may know—the dam and mill—and not the extent of the mill owner's territorial possessions in the vicinity. .

The original deed seems merely to have conveyed 20 acres that a mill seat might be located somewhere upon it. The deed to the present owner does not seem, from the case on appeal, to contain even that provision. But if the deed to the defendant had conveyed 20 acres, or 20,000 acres, and described such tract as a "mill seat" this provision in a deed would not change the meaning of a word of common usage and well defined significance when used in a statute. It would not make a whole body of land a mill site, or seat, because there was a mill run by water power somewhere within its boundaries. The setting the wire fences or traps, and taking fish therefrom "15 or 20 yards below the mill house," being "between the mouth of Bear Creek" and the "mill seat," the court properly adjudged the defendant guilty upon the special verdict. Though these ditches are filled with water and hence have fish only in overflows from the pond, the waters are part of "the waters of Bear Creek," and when

139——37

STATE *v.* SUTTON.

they go back into the main run, the fish in them are not to be restrained and caught by forbidden hedges and nets. The owner of the mill has no rights over either the water, or the fish therein, after they have gone by the wheel or dam. "The mill will not grind again with the water that has passed."

From the amount of the fine imposed—$5—we presume that this was merely a test case, to decide upon the defendant's right of catching fish by hedges or traps, which right under the statute does not extend lower down than catching them in that mode, on the sheeting, or at any other spot on the mill site, as they come down out of the pond, through the forebay or over the dam. Below that the waters of Bear Creek are free from such inventions, and

"May roll unvexed to the sea."

Affirmed.

CONNOR, J., dissenting: I cannot concur in the reasoning or the conclusion reached by the court in this case. I do not question the power of the Legislature to regulate the time, manner and place of fishing in public waters. I do not think that the right to do so in private waters is so absolute as the language of the opinion would seem to indicate. The question was so fully and satisfactorily discussed and settled by this court in *State v. Glen,* 52 N. C., 321, and *Cornelius v. Glen,* 52 N. C., 512, that I could not hope to add to it anything of value or interest. It is quite clear that the court did not recognize any power to interfere with the right of the owner of the bed of the stream, to the use of it except in the exercise of the right of eminent domain, subject to its limitations. In *State v. Pool,* 74 N. C., 402, the question of the power of the State to make the obstruction of non-navigable streams by the owner of the bed indictable, was fully considered and denied. *Mr. Justice Bynum* cites with approval the language used by the court in the *Glen cases,* concluding with the words: "Whether the State can enforce against the

owner of the land and bed of an unnavigable creek, an act of the Legislature forbidding its obstruction to the passage of fish, is a question not raised upon this indictment and verdict and need not be discussed. *Mr. Justice Rodman* was joined by *Mr. Justice Reade* in a strong dissenting opinion reported in 75 N. C., 597. The doctrine upon which the decision of the *Glen cases* was decided was denied in the dissenting opinion. I do not think the question is raised in *State v. Gallop,* 126 N. C., 983. That case is well decided—but there was no point presented in regard to the rights of the owners of the bed of the stream. I do not wish to do more than notice the question and say that I think the power to enforce statutes of this kind has its limitations. I note that at the same session at which the act in question was passed similar statutes prohibiting fishing by nets, etc., in mill ponds, without any regard to their connection with navigable streams, were enacted. I cannot think that the power extends to the owners of private fish ponds, or even public mill ponds, having no outlet into navigable waters. The extent to which the owner of property may be interfered with in its use, without compensation, to serve a public interest is a serious question to be approached and dealt with carefully. I do not care to be committed to any general statement of the law without the most careful consideration. My dissent in this case is based upon my objection to the construction of the statute. This is a public statute of local application and should be construed in the light of the local conditions. Some force must be given to the term, "The Joyner Mill Seat." If the draughtsman had intended to prohibit the putting of traps below the mill, using the term as meaning the mill house or the dam, he would have said so. Statutes of this kind are usually drawn by those interested in extending the prohibition as far as possible and should be so construed that the private right of the citizen be interfered with no further than the unmistakable language demands.

It is to be noted that the prohibition is between "The Joyner Mill Seat," etc. This indicates that the land covered by the water of the "Joyner Mill Seat" was known to the draughtsman. Can there be any question that if the owner were to convey or devise "The Joyner Mill Seat," the description would carry the land originally conveyed for the mill seat and not be restricted to the spot upon which the dam or the house was situate. "The grant of a mill site conveys a water power together with the right to maintain a dam whenever such dam would be suitable for the convenient and beneficial appropriation of the water power." *Stackpole v. Curtis,* 32 Me., 383. "A grant of land bounding on or near a pond and stream, reserving the mill and water privilege, is a reservation of the right of flowing the land so far as necessary or convenient, or so far as it has been usual to flow it, for that purpose." *Pettee v. Hawes,* 30 Mass., 323. "A mill site comprehends, not only the site of the mill-building, but also the water power connected therewith for milling purposes." *Curtiss v. Smith,* 35 Conn., 156; *Tabor v. Bradley,* 18 N. Y., 109. "By a devise of a mill with the appurtenances, it has been held that a right not only to the building and use of the water, but also to the land which was used with the mill passed." *Blaine v. Chalmers,* 1 Sergt. & R., 169; Angell on Water Courses, 274. It is a matter of common knowledge that the value of a mill site is dependent upon the right to carry the water away as essentially as the right to hold it back. The "mill tail" is as much a part of the "site" as the "mill pond." The suggestion that a man might claim one or more thousand acres as his "mill site" does not impress me as shedding much light upon the question. A man will hardly buy and pay for a large quantity of land for which he has no possible use and which can serve no valuable purpose. In the decision of causes, we must deal with the facts as found by the jury. Here the person who erected this mill understood what quantity

of land with the privilege incident to its ownership was necessary to enable him to establish and maintain his mill; he purchased such quantity for a "mill seat" and the Legislature recognized the existence of this boundary and adopted it as one of the points between which and the mouth of the creek nets should not be set. To fail to give force and effect to this language is, in my opinion, to strike out "mill seat" and to write into the statute the word "mill dam" or "mill house." This would not be allowable if we were construing a will or deed, *Barnes v. Simms,* 40 N. C., 392; certainly it cannot be so to restrict the right of the citizen and make an act criminal otherwise lawful. To my mind it is a violation and dangerous innovation of the elementary rules for construing criminal statutes. If the description of the prohibited points is too indefinite, the statute would for that reason be void. Is it possible that the owner is to be made a criminal and, under our decisions, subject to be put to work upon the public roads for putting his nets in the water upon his own land an inch beyond the eaves of his mill house or over his dam? If the mill house be adopted as the test and it be enlarged or diminished in size, the standard is changed. If the dam be adopted and it be lowered or raised by which its top is drawn up or projected down stream so much as an inch, the same result follows. The deed conveying the land for "The Mill Seat" is certain, fixed and unchangeable. The State certainly owes to the citizen the duty, when it makes the exercise of a purely private right upon his own property, a crime, to inform him with reasonable certainty the limits within which he may enjoy his right for which he has paid his money. If there be more than one standard suggested, that which is certain, fixed and recognized should be adopted, rather than that which is uncertain and subject to change. I, of course, concur in the opinion that the defendant has not violated the statute in placing his nets under his mill house. In the light of the

STATE *v.* SUTTON.

finding by the special verdict that "many years ago the original conveyance of this mill property conveyed about twenty acres of land for a mill seat." I think that the term "The Joyner Mill Seat" used in the statute should be so construed that the prohibition be limited to the lower line of the mill seat. It will be noted that the indictment does not charge, nor does the special verdict find, that the defendant ever caught or obstructed the passage of any fish in his ditches. It is simply found that some twenty yards below the mill house are some ditches on defendant's land, one 'of which was cut to drain a swamp into the mill tail—the other was cut while the mill was being built to turn the water to prevent its interference with the work. When the water is turned into them "fish can and sometimes do get into said ditches and are prevented from escaping by a wire hedge put by defendant across the ditch." The ditches are in no sense a part of Bear Creek. It does not appear how far they run up into defendant's land. I do not think they are within the words of the statute, nor do I think it competent for the Legislature to prohibit the owner from placing nets or hedges across his own ditch unless doing so constitutes a public nuisance. *State v. Pool, supra.* This is an unwarranted and unreasonable interference with the use of private property. I cannot but think that it will be a startling discovery to the owners of land in the eastern section of the State that every ditch cut upon or through their land into the bordering swamps or creeks are a part thereof, and that they are criminally liable for putting a wire net or driving stakes into them. I cannot see why an act prohibiting the obstruction of the highway may not, by the same liberal canon of construction be held to include private paths connecting with the highway. We may soon find upon the adjournment of some session of the Legislature that a man may not, with safety, walk over his own land or gather flowers which grow upon the side of his path or the

banks of his ditches, without liability to be put upon the public roads as a criminal. While the policy of the State in protecting the propogation of fish should be sustained, the right to the use of private property should not be sacrificed. We are in danger of surrounding our people with a multitude of criminal statutes, many of which are invasions of personal liberty and the use of property which will if not checked convert the people of the whole State into either conscious or unconscious violators of the law. No man may safely do or omit to do such a multitude of acts that the law will become a labyrinth in which he will not walk in safety.

