Battle, J.
 

 The act under which the defendant is indicted, after directing, in the first and second sections, that the Pedee and Yadkin rivers shall be opened and kept open for the passage of fish, and prescribing the manner in which it shall be done, declare^ in the third section, “that all persons now having obstructed the passage of fish up the said river, (the Yadkin) either by the erection of mill-dams, or dams for any other purposes, or in any manner whatever, shall have obstructed the free passage of fish contrary to the true meaning of this act, and shall fail to remove all such obstructions on or before the first day of March next; or any other person or persons who may hereafter obstruct the said channel by dams, hedges, seins, wire, or in any way or manner, shall forfeit the sum of fifteen dollars, &c.;” and the fourth section makes the offense a misdemeanor, and subject to indictment. See acts of 1858, ch. 244. The special verdict sets forth that the de
 
 *323
 
 fiendant had, in the year 1857, which was before the enactment of the law above referred to, erected a dam entirely across the Yadkin river, from bank to bank, which obstructed the passage of fish up that stream; and had kept up the same for the purpose of supplying water to his grist and saw mills, until the time Avlien the bill of indictment was found. It states further, that he was the owner of the river’s bed on which his dam was erected, under a grant for the same from the State, issued in the year 1794; and also, the owner under distinct grants of a prior date, of the land on both sides of the river at that place, the river being one of the boundaries of the said grants; that the river is at that part of it an inland stream, one hundred and seventy yards wide, but above the ebb and Aoav of the tide, and not so full open and deep as ever to have been navigated with steamboats, or sailing vessels, but naAdgable only for fiats and canoes in crossing; and that within the last twenty years, on a fevv occasions, lime and flour have been carried in flats from a point on the river, thirty-five miles above the defendant’s dam, to another point fifty miles beloAV it.
 

 Upon this statement of facts, the indictment presents the question, whether the Legislature had the power, under the constitution of the State, and the United States, to compel the defendant to take away, at his own expense, a part of his dam, so as to make an opening for the passage of fish, without providing for him an indemnity for the loss which he might thereby sustain.
 

 Every case which calls in question the constitutionality of an act of the legislative department of the government, is necessarily an important one, and the consideration of it ought to be approached and conducted Avith becoming solemnity and respect. Our predecessors were the first of any Judges, in any State in the Union, to assume and exercise the jurisdiction of deciding that a legislative enactment was forbidden by the constitution, and, therefore, null and void. (See
 
 Bayard
 
 v. Singleton, Martin, (N. C.) Rep. 48, decided in November, 1789, which was four or five years anterior to the earliest
 
 *324
 
 case on this subject, referred to by Chancellor Kent; 1 Kent’s Com. 450. But while they were the first to vindicate for themselves this important function, they have always exercised it in a spirit of proper deference towards that coordinate branch of the government upon whose acts they were sitting in judgment. Hence, it has become a settled and invariable rule with the courts of this State, never to pronounce an act of the Legislature unconstitutional and void, unless there is a clear repugnance between its provisions and the constitution;
 
 State
 
 v.
 
 Manuel,
 
 4 Dev. and Bat. Rep. 20;
 
 State
 
 v.
 
 Newsom,
 
 5 Ired. Rep. 250;
 
 State
 
 v.
 
 Matthews,
 
 3 Jones’ Rep. 451. It is in this spirit that we propose to consider the question now presented for our decision.
 

 In conducting our enquiry, it is first necessary for ris to ascertain the true condition and character of the river, across the bed of which, the defendant’s mill-dam was erected. For this purpose, we will go at once to the highest authority on the subject, Lord Hale’s treatise
 
 dejwre maris et braehiomtm ejusdem,
 
 in Mr. Hargrave’s edition of it. He says, at page 809, “There be some streams or rivers that are private, not only in propriety or ownership, but also in use, as little streams or rivers,
 
 that are not a common passage for the King's people.
 
 Again, there be other rivers, as well fresh as salt, that are of common or public use for carriage of boats and lighters, and these, whether they are fresh or salt, whether they flow and reflow or not, a
 
 ve prima facie publiei juris,
 
 common highways for a man or goods, or both, from one inland town to another.” Again, at page 5, he says, “Fresh rivers of what kind soever, do of common right belong to the owners of the soil adjacent, so that the owners of one side have, of common right, the propriety of the soil, and consequently, the right of fishing
 
 usgue ad filum aguce,
 
 and owners of the other side, the right of soil or ownership, and fishing unto
 
 thafihim aguoe
 
 on their side; and if a man be owner of the land on both sides, in common presumption, he is the owner of the whole river, and hath the right of fishing according to the extent of his land in length; with this agrees the common experience.”. From these ex
 
 *325
 
 tracts its appears that “ all rivers above the flow of tide water, are by the common
 
 law, prima faeie
 
 private; but when they are naturally of sufficient depth for valuable
 
 floatage,
 
 the public have an
 
 easement
 
 therein for the purposes of transportation and commercial intercourse; and, in fact, they are
 
 piibMo highways
 
 by water.” But, they “ are called public rivers, not in reference to
 
 the property
 
 of the river, for that is in the individuals who own the land, but in reference only, to the public use;” Angel on Water Courses, sec. 535. With regard to the right of fishing, if a man be the sole owner of the soil over which a water course runs, he alone is entitled to the use and profits of the water; but, if he be only a reparian proprietor, on one side of the stream, his right to the water extends only to the middle of the stream. “Concomitant with this interest in the soil of the beds of water courses, is an exclusive right of fishing; so that the reparian proprietor, and he alone, is authorised to take fish from anjr part of the stream included within his territorial limits.” Ibid, see. 61.
 

 In England, navigable waters, which
 
 are publiei jwris,
 
 and as such, distinguishable from those which we have been describing, are ascertained by the ebb and.flow of the tide.— This criterion has been held by our courts not to be applicable to the water courses of North Carolina, and has been long since repudiated. We hold, that any waters, whether sounds, bays, rivers or creeks, which are wide enough and deep enough for the navigation of sea vessels, aye navigable waters, the soil under which is not the subject of entry and grant under our entry law, and the rights of fishing in which are, under our common and statute law, open and common to all the citizens of the State;
 
 Wilson
 
 v.
 
 Forbes,
 
 2 Dev. Rep. 30;
 
 Collins
 
 v.
 
 Benbury,
 
 3 Ired. Rep. 277; S. C., 5 Ired. Rep. 118;
 
 Fagan v. Armstead,
 
 11 Ired. Rep. 438, and
 
 State
 
 v.
 
 Dibble,
 
 4 Jones’ Rep. 107. In streams not navigable, the bed of the river may be, under the general entry law, the subject of a grant to a private individual; and the reparian proprietor will be, without any express grant of the bed of the stream, entitled to the
 
 *326
 
 propriety of the soil, and the right of fishing
 
 usque ad filum aquce; Williams
 
 v.
 
 Buchanan,
 
 1 Ired. Rep. 535.
 

 It is manifest, from the description of it in the special verdict, that the river Yadkin is not a navigable stream, at or near the place where the defendant’s dam was built. It certainly was not navigable in fact for sea vessels, and, therefore,, is not a water course altogether,
 
 publiei juris.
 
 It is very doubtful whether it can be considered, in its present condition, as so far public, that all persons have an
 
 easement
 
 in it for the purposes of transportation and commercial intercourse, for it is said to be “navigable for flats and canoes in crossing; and that within the last twenty years, on a few occasions, lime and flour have been carried in flats,” down it from one point to another. In
 
 Menson
 
 v. Hungerford, 6 Barbour’s (N. Y.) Rep. 265, it was held that a stream above the ebb and flow of the tide, which is not navigable for boats or vessels or rafts, is not a navigable stream within the meaning of the authorities, though, when swollen by the spring and autumn floods, it might be capable, three or four weeks in the year, of carrying down in its rapid course whatever might have been thrown upon its waters, to be' borne at random over every impediment; but that such stream was altogether private property. It is unnecessary, however, for us to decide this point, for it is certain that the Yadkin river is capable of private ownership, and that some parts of the bed of the river have been granted to private individuals, and the validity of their titles have been upheld by at least one decision of this Court. See
 
 Smith
 
 v. Ingram, 7 Ired. Rep. 175. This case relates to the grants of the bed of the Pedee river, but it must necessarily apply to the Yadkin, which is the upper part of the same river.
 

 The principles to which we have adverted, will enable us to determine the nature and extent of the defendant’s right in the river at the point where his mill and dam are situated.— As the repairian proprietor of the land on both sides of the stream, he is clearly entitled to- the soil entirely across the river, subject to an
 
 easement
 
 in the public for the purposes of
 
 *327
 
 the transportation of lime, flour and other articles in flats and canoes. He is also, as such proprietor1, entitled to the exclusive right of fishing entirely across the streamj but as the proprietors above him have the same right to catch fish on their soil, his right must be so used as not to prevent a reasonable use of theirs. Hence, he cannot by force of his reparian proprietorship, merely, erect any dam, or put any other obstrucstruction in the river so as to prevent altogether the passage of fish up it. The golden rule of law
 
 sic utere tino ut non alienum
 
 Icedas, applies to him, and its observance may, no doubt, been forced by statutory enactments. Hence, the various acts which have been passed by the Legislature, from time to time, for the last hundred years, for the purpose of preventing obstructions to the passage of fish up almost all the rivers and creeks of any size in the State, and for regulating in other respects the rights of fishing, are not inconsistent with any provision of the constitution, aud have generally been dictated by a sound and correct policy; and of them, the defendant, as a riparian proprietor, merely, would have no just cause to complain. But he is much more than a riparian owner. He claims under a direct grant from the State for the bed of the river, in which the State, for what she deemed a fair equivalent, conferred on those from whom he derives title the full ownership of the soil, without any reservation whatever, except the right to impose such imposts and taxes as may be neeessary for the support of the government. In the exercise of his power of dominion over the soil, he has erected thereon grist and saw mills, and a dam which is necessary to supply them with water. Can the State now, by means of a Legislative enactment, take from him this property, or do any thing to materially impair its value, without making him a fair compensation therefor? It is established by the greatest weight of authority, that she cannot do so for any other than a public purpose, either with or without compensation; Fle
 
 tcher
 
 v.
 
 Peak,
 
 6 Cranch Rep. 128;
 
 PLoke
 
 v.
 
 Henderson, 4
 
 Dev. Rep. 1;
 
 Stanmire
 
 v.
 
 Taylor,
 
 3 Jones’ Rep. 207. That the requisition made upon the defendant to take
 
 *328
 
 away a part of his dam, or to alter it in such a manner as to allow the free passage of fish up the channel of the stream comes within the same principle of conservative right, seems so be fully established by the ably argued and well considered case of the
 
 People
 
 v. Platt, decided by the Supreme Court of New York, in 1819, and reported in 17 John. Rep. 195.- — It was there held, that by a patent granted to one Zepheniah Platt, in 1784, of a tract of land bounded on the east by lake Champlain, and extending west on both sides of the river Saranac, seven miles square, the whole river, to that distance passed to the patentee; and that as there was no reservation of the river, nor any restriction in the use of it, the public had no right of fishing in it, within the bounds of the patent; and that, therefore, the erection of a dam, by the patentee, in 1786, near the mouth of the river, by which salmon were prevented from passing up the stream from the lake, was not indictable as a nuisance, neither at common law, nor under a statute, which enacted that the owners of mill dams made across any river running into lakes Ontario, Erie or Champlain, so as to prevent the usual course of salmon in going up, should, within eighteen months from the passage of that act, so alter the dam by making a slope thereto, that salmon may easily pass up over into the waters above the dam, &c., and, in case such dam should not be so altered, it should be deemed a public nuisance. In delivering the opinion, the Court said the. statute ought to be construed with an implied exception of such rivers or streams, not being navigable, as had been fully and absolutely granted by the State without any reservation; and that so far as it affected the rights of Zepheniah Platt and his assigns, it impaired the obligation of a contract, and was unconstitutional and void. In the New York case, as in the one now before us, the case of
 
 Stoughton
 
 v. Baker, 4 Mass. Rep. 522, was strongly pressed in the argument, as establishing a different principle, but the Court declined to acquiese in it as an authority, for the following reasons assigned by Spencer, C. J.:
 

 “ In that case, the Supreme Court of Massachusetts held,
 
 *329
 
 that a Legislative resolution appointing a committee, who were authorised to require the proprietors of certain dams, on the Nepsonset river, to alter them in such a way, as should be sufficient for the passage of shad and alewives, at the dams, was a legal proceeding, not repugnant to the constitution. The opinion is founded on the ancient and long continued usage, of the General Court of Massachusetts, to appoint commissioners to locate and describe the site and dimensions of passage ways for fish, and under the circumstances of the case, it was held that the right of the proprietor of the dam was subject to the limitation, that a reasonable and sufficient passage should be allowed for the fish. The Court, however,1 expressly say, that any prostration of the dam, not within the limitation, would be an injury to the owner, for wdiich he might appeal to his country, and have a remedy ; and that if the government, in the grant of a mill privilege, expressly, or by necessary implication, waive this limitation, it would be bound. In the case then, under consideration, the Court said, it would be an unreasonable construction of the grant to admit, that by it, all the people were deprived of a free fishery in the river above the dam, to which, until the grant, they were unquestionably entitled. Whether, in that case, the Nepsonset river was navigable above the dam, is no where affirmed or denied; but it is perfectly clear, that the Court proceeded on local usages and customs, and not upon the general and received doctrines of the common law ; for not a single case is referred to, nor is it even asserted, that the principles advanced are sanctioned by the English common law.” In addition to what was said by Spencer, C. J., to weaken the force of
 
 Stoughton
 
 v.
 
 Baker,
 
 as an authority, it may be remarked, that what was said by the Court'upon the subject, now under consideration, was entirely unnecessary for the decision of the cause, as judgment was given for the defendant, upon another and distinct ground. It must be admitted, however, that even the dicta of C. J. Parsons, when well considered, are entitled to great weight, but as his opinion was founded on local customs and usages, and not upon the principles of the
 
 *330
 
 common law,
 
 it
 
 cannot have any influence upon the question, which we are now discussing. We are not apprised that any principles, other than those of the common law, have ever prevailed in this State, in relation to our water courses. O.n the contrary, we think, it will be found, that our courts have always adopted, and applied the principles of the common law to all our waters, so far as they were applicable to the peculiar geographical condition of the State. We have seen, that the incidental rights of the riparian proprietors of our unnavigablc streams, are the same with those in England, and the various acts of the General Assembly, which have been passed, from time to time, for the purpose of keeping open the streams for the passage of fish, have done nothing more than recognise those rights and regulate the manner of their enjoyment. From the case of
 
 Hooker
 
 v. Cummings, 20 John. Rep. 90, it seems that the same rules, prevail in the State of New York.
 

 If our argument has been so far well founded, the conclusion has been established, that the defendant’s mill property cannot be taken from him, nor its value materially impaired by any Legislative enactment for any other than the public use. Is the right of catching fish, which is incidental to the propriety in the soil,
 
 usque ad filu/m coquee,
 
 which belongs to' the reparian proprietors living above the defendant, on the Yadkin river, such an one, that its enforcement and protection can be considered-a public use? That is a question, which it will be unnecessary for us to decide, if we ascertain the law to be that the defendant’s interest in his mill cannot be destroyed, taken from him, or materially impaired in value for the use of the public, by the Legislature, without making him a fair and adequate compensation therefor. Upon this point, we have no doubt; and our opinion is, that the act, upon which the indictment is based, is clearly repugnant to our State constitution, because it not only does not give him any compensation for the damage he may sustain by the destruction of his dam, but actually requires him, under a heavy penalty, for failing to comply, to destroy it himself, and at his
 
 *331
 
 own expense. The right to compensation for private property, taken for public use, is expressly provided in the constitution of the United States, in the last clause of the 5th article of the amendments to the constitution. That clause is in these words : “Nor shall private property be taken for public use without just compensation,” but that has always been understood to be a limitation of the Federal Government, and not of that of the States;
 
 Barrow
 
 v.
 
 The Mayor of Balti
 
 more,
 
 1
 
 Peter’s Eep. 243. There is no such express restriction of the power of the government to be found in our State constitution, but it has been generally supposed to exist;-and it is strongly intimated in the case of the
 
 Raleigh & Gaston Rail Road Company
 
 v. Davis, 2 Dev. and Bat. Rep. at page 460, that it may be implied from the 12th section of the Bill of Eights, which declares, “ that no freeman shall be disseised of his freehold, or deprived of his life, liberty or property, but by the law of the land.” “ Under the guaranty of this article, (say the Court) it has been held, and in our opinion properly held, that private property is protected from the arbitrary power of transfering it from one person to another.
 
 We
 
 doubt not it is also protected from the po.wer of despotic resumption upon Legislative declaration of forfeiture, or merely to deprive the owner of it, or to enrich the treasury, unless, as a pecuniary contribution, by way of tax. Such acts have no foundation in any of the reasons, on which depends the power, in virtue of the right of eminent domain, to take private property for the public use, and they could not be sustained by the offer of the fullest compensation. Though not so- obvious, it may also be true, that the clause, under consideration-, is restrictive of the right of the public to the use of private property, and impliedly forbids it without compensation. But it is a point, on which the court is not disposed, nor at liberty, to give a positive opinion.” The reason why the Court did not give a positive opinion on the subject was, that it was unnecessary, because the charter of the rail-road company did provide compensation for the defendant, and all other persons, whose lands were taken for the use of the road ;, and the
 
 *332
 
 Court held that -the payment of the land-damages, as they were called, ‘need not precede the occupation of the lands by the company, for the purposes of the road. Had the case demanded it, we cannot doubt, that the Judges, who then composed the Court, would have decided, in favor of the restriction, and in doing so, they would have found themselves sustained, by similar decisions, in many of our sister States. See the cases referred to in Angel on Water Courses, section 461, note 2. Our Legislature has always, with very rare exceptions, exercised the power of eminent domain in the just and liberal spirit of providing a fair compensation for private property taken for the public use. This will appear in all the charters which it has granted to rail-road and navigation companies, and other companies of a like kind. There is a seeming exception to this in the act of 1854, ch. 170, entitled “ An act to incorporate the Yadkin Navigation Company,” and the act supplemental thereto passed at the same session, and numbered as chap. 171. The first of these acts, provided in the 11th and 12th sections, for compensation to such persons, whose land, or other property, might be taken for the use of the company ; and in the 11th section, forbade the company from invading the mill-house or mill-dam of any person without his consent; but the supplemental act repealed this part of the 11th section, and then declared that “ the said company shall have full and ample powers to remove all^ obstructions to the free and convenient navigation of said river, whether the same have been erected by individuals or otherwise exist.” This act, we learn, was passed upon the supposition, that the only obstructions in the river were put there by the reparian proprietors, which it was supposed the company created for the express purpose of making the river navigable, had the right to remove without making compensation to the owners. It was not then generally known, that any person had a grant from the State
 
 for
 
 the bed of the river, in that part of it, as the defendant had not, at that time, erected his dam across the stream. It will be observed, that neither the act of 1854, chapter 170, nor the previous ones of 1852,
 
 *333
 
 chapter 86; 1850, chap. 115, and 1816, (chapter 930, of the Rev. Code of 1820,) (all of which were passed for the purpose of creating companies to open and improve the navigation of the Yadkin river,) professed to declare the river to be a navigable stream, and thereby to make it such in law ; as we held, in the
 
 State
 
 v. Dibble, 4 Jones’ Rep. 107, was done with regard to the river Neuse.
 

 The authorities to which we have referred, and the principles plainly deducible from them, enable us to state the following, as a summary of the law of North Carolina, in relation to the water courses of the State :
 

 1. All the bays and inlets on' our coast, where the tide from the sea ebbs and flows, and all other waters, whether sounds, rivers or creeks, which can be navigated by sea vessels, are called navigable, in a technical sense, are altogether
 
 jpiibUoi
 
 juris, and the soil under them, cannot be entered, and a grant taken for it, under the entry law. In them, too, the right of fishing is free ; see
 
 Collins
 
 v. Benbury, and the other cases to which we have referred on this point.
 

 "Where the tide ebbs and flows the shore, between the high and low water, is also within the prohibition of private appropriation, under the general entry law, but may be the subject of a direct, special Legislative grant;
 
 Ward
 
 v.
 
 Willis.
 
 6 Jones’ Rep. 183.
 

 2. All the rivers, creeks, and other water courses, not embraced in the above description, but which are, in fact, sufficiently wide and deep to be navigable by boats, flats and rafts, are technically styled unnavigable, and are open to be appropriated by individuals, by grants from the State, under the entry laws. When the bed of the water course is not included in the grant, but the stream is called for as' one of the boundaries, the grantee is entitled, as an incidental easement, to go to the middle of the stream, and may exereise and enjoy that easement, for the purpose of catching fish, or in any other manner, not incompatible with the right which the public have in the stream, for water communication, between different points on it. The mode, and the extent of the en
 
 *334
 
 joyment of this easement, may be regulated by statute, and as the reparian proprietors paid nothing into the pnblic treasury for it, the soil which composes the bed of the river may be granted to others, and the Legislature may,
 
 perhaps,
 
 resume the incidental rights, for the public use, without making compensation for them; though, tve believe it has often given such compensation; see
 
 Threadgill
 
 v. Ingram, 3 Dev. Rep. 59 ;
 
 Smith v.
 
 Ingram, 7 Ire. Rep. 175, and the various charters granted to companies, for improving the navigation of nearly all our largest rivers.
 

 3. All the rivulets, brooks and other streams, which, from any cause, cannot be used for intermunication by inland navigation, are entirely the subjects of private ownership, are generally included in the grants of the soil, and the owners may make what use of them they think proper, whether it be for fishing, milling or other lawful trade or business. The only restriction, upon this right of ownership, arises
 
 ex necessitate,
 
 from the nature of running water; and it is that the owner shall so use the water, as not to interfere with the similar rights of other proprietors above, or below him, on the same stream. See
 
 Pugh
 
 v.
 
 Wheeler,
 
 2 Dev. and Bat. Rep. 50. Eights acquired in streams of this class by grants from the State, or in water courses of the second class, by grants from the State for the bed of the stream, cannot be taken from the owners by the government, except in the exercise of. the power of eminent domain, and then only for public use, with a provision for the just compensation ; see
 
 Raleigh and Gaston Rail Road Company
 
 v.
 
 Davis, ubi supra.
 

 Believing that the,act of the General Aesembly, under which the defendant is indicted, so far as it affects him, is unconstitutional and void, we must direct that the judgment, rendered against the defendant, be reversed, and a judgment rendered for him. To that end, this opinion will be certified to the Court below.
 

 Per Curiam,
 

 Judgment reversed.