IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-558

No. COA20-333

Filed 19 October 2021

Catawba County, No. 17 CVS 194

DUKE ENERGY CAROLINAS, LLC, Plaintiff,

v.

MICHAEL L. KISER, ROBIN S. KISER, and SUNSET KEYS, LLC, Defendants/Third-Party Plaintiffs,

v.

THOMAS E. SCHMITT and KAREN A. SCHMITT, ET AL., Third-Party Defendants.

Appeal by Defendants from orders and judgments entered 27 August 2018 and 2 January 2020 by Judge Nathaniel J. Poovey in Catawba County Superior Court. Heard in the Court of Appeals 24 February 2021.

*Redding Jones, PLLC, by Ty K. McTier and David G. Redding, for Defendants-Appellants.*

*Troutman Sanders LLP, by Kiran H. Mehta and Victoria A. Alvarez, for Plaintiff-Appellee.*

*Jones, Childers, Donaldson & Webb, PLLC, by Mark L. Childers, Kevin C. Donaldson, and C. Marshall Horsman, III, for Third-Party Defendants-Appellees.*

*David P. Parker, PLLC, by David P. Parker, for Thomas E. Schmitt, Karen A. Schmitt, Linda Gail Combs, and Robert Donald Shepard, Third-Party Defendant-Appellees.*

WOOD, Judge.

¶ 1    This case concerns the rights of third-party landowners to build and maintain docks and other structures over and into the submerged land belonging to another, such land comprising a portion of the lakebed, subject to the easement of a power company.  For reasons outlined below, we reverse and remand.

## I.    Factual and Procedural Background

¶ 2    From 1946 to 1960, before the construction of Lake Norman, B. L. and Zula Kiser (the "Kiser Grandparents") acquired the land at issue in fee simple.  In 1960, much of the bed of Lake Norman was dry.  By 1961, Duke Power Company ("Duke")[1] intended to flood lands adjacent to the Catawba River, the river that now feeds Lake Norman, with the construction of the Cowan's Ford Dam.  Duke obtained titles and easement rights to those lands that are now submerged under Lake Norman pursuant to the requirements of a Federal Energy Regulatory Commission ("FERC") license.  The majority of the owners of the now submerged land sold their property in fee to Duke, while the Kiser Grandparents chose to grant only easements to Duke. The Kiser Grandparents granted Duke the following easements:

> [A] permanent easement of water flowage, absolute water
> rights, and easement to back, to pond, to reaise [sic], to

---

[1] In the present case, Duke Energy Carolinas, LLC is the controlling subsidiary of Duke Energy Corporation (previously Duke Power Company) and is likewise referenced as "Duke."

flood and to divert the waters of the Catawba River and its tributaries in, over, upon, through and away from the 280.4 acres, more or less, of land hereinafter described, together with the right to clear, and keep clear from said 280.4 acres, all timber, underbrush, vegetation, buildings and other structures or objects, and to grade and to treat said 280.4 acres, more or less, in any manner deemed necessary or desirable by Duke Power Company.

. . . .

And . . . a permanent flood easement, and the right, privilege and easement of backing, ponding, raising, flooding, or diverting the waters of the Catawba River and its tributaries, in, over, upon, through, or away from the land hereinafter described up to an elevation of 770 feet above mean sea level, U.S.G.S. datum, whenever and to whatever extent deemed necessary or desirable by the Power Company in connection with, as a part, of, or incident to the construction, operation, maintenance, repair, altering, or replacing of a dam and hydroelectric power plant to be constructed at or near Cowan's Ford on the Catawba River . . . .[2]

¶ 3        The first easement (the "Flowage Easement") references 280.4 acres of land by metes and bounds, which topographically rested below an "elevation 760 feet above mean sea level," and which would become part of the bed of Lake Norman. The second easement (the "Flood Easement") references land by metes and bounds which topographically rested between 760 feet and "770 feet above mean sea level," that would remain dry land, but subject to flooding, after the creation of Lake Norman.

---

[2] For purposes of review, the language of the easement here reflects a filed copy that immaterially differs from the original through spelling and grammatical differences.

The Kiser Grandparents and their successors made no further grants or conveyances of the land to Duke.

¶ 4        In 1963, Duke flooded the lands that today comprise Lake Norman. Of those lands not submerged, the Kiser Grandparents retained an area of land that became an island (the "Kiser Island"). The Kiser Grandparents subsequently subdivided the Kiser Island into residential waterfront lots and conveyed title in fee simple to most of those lots to various buyers (the "Third Parties") between 1964 and 2015. The Kiser Grandparents retained at least one lot (the "Kiser Lot") for their continued personal use.

¶ 5        Consistent with its license from the FERC to dam the Catawba River, Duke instituted a project plan that outlined requirements and a permitting process for the construction of shoreline improvements into the waters of Lake Norman. Relying upon Duke's permitting process, many of the Third Parties on Kiser Island proceeded to construct docks and other structures that extended from the dry land of their lots over and into the waters of Lake Norman, and "that are anchored to or at least touch in some way . . . the submerged tract, the Kiser property that's beneath Lake Norman." Some of these structures were built prior to when Duke's permitting process began and were memorialized as existing when the procedure commenced.

¶ 6        In 2015, M. L. Kiser ("M.L."), a grandson of the Kiser Grandparents, erected a retaining wall (the "2015 wall") approximately seventeen and a half feet from the

Kiser Lot into Lake Norman and upon the 280.4 acres to which Duke has an easement. M.L. began backfilling the wall to add additional dry surface area to the Kiser Lot, which extended his shoreline. Unlike the Third Parties, M.L. did not originally apply for a permit from Duke to construct the 2015 wall; though, the new construction did encompass land previously submerged and subject to Duke's Flowage Easement.

¶ 7        In response to this construction, Duke issued a Stop-Work Directive, and the North Carolina Division of Water Resources notified M.L. that the construction of the wall would impact the waters of Lake Norman. A survey conducted on the Kisers' property by a licensed professional land surveyor in August 2016 revealed that "the total area of the retaining wall and backfill within Lake Norman is approximately 2,449 square feet."

¶ 8        After the death of M.L.'s father in March 2016, he and his two brothers became the owners of the land at issue. That land was then conveyed to Sunset Keys, LLC ("Sunset Keys"), of which M.L. and his two brothers are the members.

¶ 9        On January 27, 2017, Duke commenced this action against M. L. Kiser, his wife, Robin S. Kiser, and, later, Sunset Keys, LLC ("the Kisers") alleging trespass and wrongful interference with an easement and requested injunctive relief. The Kisers responded with counterclaims against Duke, challenging Duke's authority under the easements to demand removal of the 2015 wall, to issue permits to the Third Parties

for the construction of docks on their lots, and to open the waters above those lots to recreational use. The Kisers subsequently moved to join the Third Parties as defendants on February 13, 2017.

¶ 10    Duke moved for partial summary judgment regarding its claim for injunctive relief on August 13, 2018. The trial court entered an order and judgment granting partial summary judgment on August 22, 2018 (the "2018 Order"), to have the 2015 retaining wall and the backfilled area cleared.[3] Duke and the Third Parties then moved for summary judgment denying all of the Kisers' counterclaims and allowing Duke's remaining trespass claim on October 24, 2019, and October 25, 2019, respectively. On November 15, 2019, the trial court entered an order and judgment enforcing the 2018 Order.

¶ 11    On January 2, 2020, the trial court entered an order and judgment (the "2020 Order) granting summary judgment in favor of Duke and the Third Parties by quieting title in the lots, improvements, and use of the waters to the Third Parties. The trial court ruled Duke had operated within its "Scope of Authority" when it granted permission for the Third Parties to construct improvements over and into the Kiser's submerged land. The trial court stated, "[T]his Order and Declaratory Judgment does not dispose of all the claims in this action." The Kisers filed and

---

[3] For reasons stated below, the 2018 Order to remove the wall and fill material is not reviewed here.

served a notice of appeal for the 2020 Order on January 24, 2020, and later filed and served a notice of appeal for the 2018 Order on February 3, 2020. While the 2020 Order was certified for review pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b), the 2018 Order was not.

## II. Discussion

¶ 12 We review a trial court's summary judgment order *de novo*. *Forbis v. Neal*, 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007). "Under a *de novo* standard of review, this Court considers the matter anew and freely substitutes its own judgment for that of the trial court." *Reese v. Mecklenburg Cnty.*, 200 N.C. App. 491, 497, 685 S.E.2d 34, 38 (2009) (citations omitted). We cannot affirm a trial court's summary judgment order if a "genuine issue as to any material fact" remains when viewed in the light most favorable to the non-moving party. *Forbis*, 361 N.C. at 524, 649 S.E.2d at 385 (quoting N.C. R. Civ. P. 56(c)). When reviewing a summary judgment order, "we view the evidence in the light most favorable to the non-movant." *Scott & Jones, Inc. v. Carlston Ins. Agency, Inc.*, 196 N.C. App. 290, 293, 677 S.E.2d 848, 850 (2009) (quoting *Baum v. John R. Poore Builder, Inc.*, 183 N.C. App. 75, 80, 643 S.E.2d 607, 610 (2007) (citation omitted)).

¶ 13 Because not all issues are disposed of in this case, we review this case as an interlocutory appeal. *See Larsen v. Black Diamond French Truffles, Inc.*, 241 N.C. App. 74, 76, 772 S.E.2d 93, 95 (2015). The parties correctly note that a non-certified,

interlocutory judgment is not ripe for review when the appellant does not raise the issue in the appellant's principal brief. *Id.* at 79, 772 S.E.2d at 96. This being true of the 2018 Order, we decline to review the 2018 Order and limit our review and analysis to the 2020 Order.

## A. Third Party Activity upon Easement

¶ 14        The Kisers first contend Duke did not act within its scope of authority when it permitted the use of the 280.4 acres to the Third Parties without the Kisers' consent and the trial court ultimately erred in quieting title of the lakefront structures to the Third Parties. We agree.

¶ 15        A "cloud upon title" arises when there is a claim or encumbrance that affects the ownership of a property. *See York v. Newman*, 2 N.C. App. 484, 488, 163 S.E.2d 282, 285 (1968) ("A cloud upon title is, in itself, a title or encumbrance, apparently valid, but [is] in fact invalid. It is something which, nothing else being shown, constitutes an encumbrance upon it or a defect in it." (citation omitted)). The elements have been defined by this Court as "(1) the plaintiff must own the land in controversy, . . . and (2) the defendant must assert some claim in the land adverse to plaintiff's title, estate, or interest." *Greene v. Trustee Servs. of Carolina, LLC*, 244 N.C. App. 583, 592, 781 S.E.2d 664, 671 (2016) (citations omitted); *see also York*, 2 N.C. App. at 488, 163 S.E.2d at 285; *Hensley v. Samel*, 163 N.C. App. 303, 307, 593 S.E.2d 411, 414 (2004).

¶ 16　　　　The elements of a "cloud on title" action are the same as those for a "quiet title" claim. *See Greene*, 244 N.C. App. at 591-92, 781 S.E.2d at 670-71; *see also Quinn v. Quinn*, 243 N.C. App. 374, 380, 777 S.E.2d 121, 125 (2015) (citation omitted). The purpose of a quiet title or cloud upon title action is to "free the land of the cloud resting upon it and make its title clear and indisputable." *Resort Dev. Co. v. Phillips*, 278 N.C. 69, 77, 178 S.E.2d 813, 818 (1971) (citation omitted). Here, the land at issue is owned by the Kisers and subject to easements granted to Duke by the Kiser Grandparents. The Third Parties are not parties to the easement.

¶ 17　　　　"An easement is an incorporeal hereditament, and is an interest in the servient estate. . . . 'A right in the owner of one parcel of land, by reason of such ownership, to use the land of another for a special purpose not inconsistent with a general property in the owner.' " *Davis v. Robinson*, 189 N.C. 589, 597-98, 127 S.E. 697, 702 (1925) (citations omitted). More simply, an "easement is a privilege, service, or convenience which one neighbor has of another." *Id.*

¶ 18　　　　Beginning with the nature of easements generally, "[a]n easement deed, such as the one in the case at bar, is, of course, a contract." *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962). "A contract which is plain and unambiguous on its face will be interpreted as a matter of law by the court." *Simmons v. Waddell*, 241 N.C. App. 512, 520, 775 S.E.2d 661, 671 (2015) (quoting *Dept. of Transportation v. Idol*, 114 N.C. App. 98, 100, 440 S.E.2d 863, 864

(1994)).

¶ 19        The interpretation of ambiguous contracts, by contrast, "is for the jury." *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 156, 306 S.E.2d 587, 589 (1983). Ambiguity exists where the contract may be "fairly and reasonably susceptible to either of the constructions asserted by the parties." *St. Paul Fire & Marine Ins. Co. v. Freeman-White Associates, Inc.*, 322 N.C. 77, 83, 366 S.E.2d 480, 484 (1988) (quoting *Maddox v. Insurance Co.*, 303 N.C. 648, 650, 280 S.E.2d 907, 908 (1981) (citation omitted)).  Though a dispute as to contractual interpretation may lend credence to its ambiguity, *id.* (citation omitted), "ambiguity is not established by the mere fact that one party makes a claim based upon a construction of its language which the other party asserts is not its meaning." *RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC*, 251 N.C. App. 562, 568, 795 S.E.2d 641, 645 (2017) (alterations omitted) (quoting *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970)).

¶ 20        "Whenever a court is called upon to interpret a contract[,] its primary purpose is to ascertain the intention of the parties at the moment of its execution." *Lane v. Scarborough*, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973) (citation omitted).  In doing so, "[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean." *Hartford Accident & Indem. Co. v. Hood*, 226 N.C. 706, 710, 40 S.E.2d 198,

201 (1946) (citations omitted).

¶ 21 Easements may either be appurtenant or in gross. *Davis*, 189 N.C. at 598, 127 S.E. at 702. While an appurtenant easement "attaches to, passes with[,] and is an incident of ownership of the particular land" referred to as the dominant tenement, *Shear v. Stevens Bldg. Co.*, 107 N.C. App. 154, 161, 418 S.E.2d 841, 846 (1992), an easement in gross "is a mere personal interest in or right to use the land of another" that is not attached to any dominant tenement and "usually ends with the death of the grantee." *Shingleton v. State*, 260 N.C. 451, 454, 133 S.E.2d 183, 185 (1963) (citation omitted). An easement appurtenant is an easement that benefits one parcel of land, the dominant tenement, to the detriment of another parcel of land, the servient tenement. *See Nelms v. Davis*, 179 N.C. App. 206, 209, 632 S.E.2d 823, 825-26 (2006) (citations omitted).

¶ 22 In determining whether an easement is appurtenant or in gross, we look to

> the nature of the right and the intention of the parties creating it, and [such] must be determined by the fair interpretation of the grant . . . creating the easement, aided if necessary by the situation of the property and the surrounding circumstances. If it appears from such a construction of the grant . . . that the parties intended to create a right in the nature of an easement in the property retained for the benefit of the property granted, . . . such right will be deemed an easement appurtenant and not in gross, regardless of the form in which such intention is expressed. On the other hand, if it appears from such a construction that the parties intended to create a right to be attached to the person to whom it was granted . . . , it

> will be deemed to be an easement in gross. An easement is appurtenant to land, if it is so in fact, although it is not declared to be so in the deed or instrument creating it; and an easement, which in its nature is appropriate and a useful adjunct of land owned by the grantee of the easement, will be declared an 'easement appurtenant,' and not 'in gross,' in the absence of a showing that the parties intended it to be a mere personal right. In case of doubt, an easement is presumed to be appurtenant, and not in gross.

*Shingleton*, 260 N.C. at 455, 133 S.E.2d at 186 (internal citations omitted).

¶ 23      We hold the language of the easement at issue is unambiguous on its face, and, though the parties dispute whether Duke may permit third-party activity upon the easement, such dispute solicits an examination of the rights of strangers to an agreement, which is properly a matter of law. While a deed should be considered in its entirety to ascertain the intent of the parties, the Flowage Easement encompasses the land at issue here, and it is the controlling easement.

¶ 24      As to the type of easements in this case, the deed conveying both easements does not indicate on its face whether the easements here are appurtenant or in gross. The record shows that Duke owns submerged land that is adjacent to—in fact, surrounding—the Kiser's submerged 280.4 acres of land. Because of Duke's adjacent land interests and the strong presumption in favor of interpreting easements as appurtenant, we hold that the easement *sub judice* constitutes an appurtenant easement. Here, the dominant tenement is owned by Duke, and the servient

tenement is owned by the Kisers. The Third Parties are not parties to the easement.

### 1. *Duke's Scope of Authority under the Easement*

¶ 25        Turning now to the matter at issue, we address whether Duke possesses authority under the Flowage Easement to permit the Third Parties to erect and maintain structures over and into the Kisers' submerged land. We look first to the document itself and note that the Flowage Easement is broad in its scope. In its most liberal reading, the Kiser Grandparents granted "Duke . . . absolute water rights . . . to treat said 280.4 acres, more or less, in any manner deemed necessary or desirable." On its own, this language could easily be read to virtually convey a fee simple interest in the property; however, we decline to read the conveyance here in such a way.

¶ 26        The Kiser Grandparents, unlike some of their neighbors, clearly intended to retain title to the submerged 280.4 acres through the conveyance of an easement to Duke, rather than a conveyance in fee simple, and effect must be given to this decision. Though property held in fee simple cannot be said to be "more sacred" than an easement, *Sweet v. Rechel*, 159 U.S. 380, 395, 16 S. Ct. 43, 47, 40 L. Ed. 188, 195 (1895), a fundamental difference exists between the nature of these two conveyances. We recognize the broad interest conveyed to Duke under the Flowage Easement in light of the nature of easements generally.

¶ 27        The question of whether an easement holder with virtually unlimited authority to "treat" property "in any manner" includes the power for the easement holder to

permit strangers to the agreement to use the land for their own benefit has not been squarely addressed in this State. In *Lovin v. Crisp*, this Court addressed whether an easement holder could utilize water rights in his neighbor's springs to benefit other nearby landowners. 36 N.C. App. 185, 186, 243 S.E.2d 406, 407-08 (1978). Though the easement holder created an agreement with his neighbor to benefit the easement holder's land, the nearby landowners were not parties to the easement agreement. *Id.* at 186, 243 S.E.2d at 408. We concluded "that the deed created an easement appurtenant to the lands conveyed therein and to no others." *Id.* at 189, 243 S.E.2d at 409. While that case is not entirely analogous to the case *sub judice*, we nonetheless adopt the same principles in holding that, unless an easement explicitly states otherwise, an easement holder may not permit strangers to the easement agreement to make use of the land, other than for the use and benefit of the easement holder, without the consent of the landowner where such use would constitute additional burdens upon the servient tenement. *Id.*

¶ 28        This holding is consistent with the sensible principle outlined in the Restatement of Property: that "an appurtenant easement or profit may not be used for the benefit of property other than the dominant estate." Restatement (Third) of Prop.: Servitudes, § 4.11 (Am. L. Inst. 2000). Moreover, other states have adopted this rule. *See Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1238 (Colo. 1998) (holding that "an easement holder may not use the easement to benefit property

other than the dominant estate." (citation omitted)); *Thornton v. Pandrea*, 161 Idaho 301, 310-11, 385 P.3d 856, 865 (2016) (holding consistent with § 4.11); *Reeves v. Godspeed Props.*, 426 P.3d 845, 850 (Alaska 2018) (quoting Restatement (Third) of Property: Servitudes § 4.11); *Wisconsin Ave. Props., Inc. v. First Church of the Nazarene*, 768 So. 2d 914, 917 (Miss. 2000) (noting that "by granting to one party an easement for its specific use, no rights are acquired by others not a party to the instrument creating the easement. This tenant is so fundamental that Mississippi has never needed to address the issue." (citation omitted)); *but see Abbott v. Nampa Sch. Dist. No. 131*, 119 Idaho 544, 551, 808 P.2d 1289, 1296 (1991) (holding that "a third party may obtain a license from an easement holder to use the easement without the notice to and consent from the servient estate owner so long as, and expressly provided that, the use of the easement is consistent with and does not unreasonably increase the burden to the servient estate").

¶ 29        Here, the Third Parties are not mentioned in either the Flowage Easement or elsewhere in the conveyance and are, thus, strangers to the easement agreement. The Third Parties had no property interest in the land at issue when the easement was created between the Kiser Grandparents and Duke. Therefore, absent other considerations, Duke exceeded its scope of authority by permitting the Third Parties to construct and maintain structures over and into the Kisers' submerged land without the Kisers' consent.

¶ 30          It may be argued Duke's deed of easement allows it to *assign* its easement rights to the Third Parties, rather than merely grant permissive use of the land at issue. However, this theory, too, fails. As in *Grimes v. Virginia Electric & Power Co.*, 245 N.C. 583, 96 S.E.2d 713 (1957), no easement right assignment was effectuated here. In *Grimes*, an individual conveyed an easement to a power company so that the company might maintain electric lines above the individual's property. *Grimes*, 245 N.C. at 583, 96 S.E.2d at 713. Later, the power company permitted the City of Washington to affix its own lines to the company's poles upon a theory of assignment. *Id.* at 584, 96 S.E.2d at 714. Our Supreme Court dispelled that theory, holding that the power company had not assigned anything and stating that "[t]wo power companies enjoy an easement over his land. He granted only one." *Id.* Likewise, no assignment of the easement has occurred or is present in this case. Here, Duke continues to exercise its rights under the easements and has not granted or conveyed to the Third Parties its rights under the easements. Duke has allowed the Third Parties to use the land subject to the easements in accordance with permits issued by Duke and without consent from the owner of the servient estate.

### 2. *Duke's Scope of Authority under the FERC License*

¶ 31          Duke and the Third Parties assert that, regardless of Duke's authority under the easements, Duke maintains federally pre-empted authority to unilaterally permit third-party construction over and into the submerged 280.4 acres on account of

Duke's license with the FERC. While we recognize that this license requires Duke to possess certain authority to manage and control shoreline development of Lake Norman, so as to maintain Duke's license and standing with the Commission, such requirement does not, by itself, beget nor provide delegated authority to overburden or deprive others of their property. Indeed, as we held in *Zagaroli v. Pollock*, the requirements of a FERC license do "not abolish private proprietary rights." 94 N.C. App. 46, 54, 379 S.E.2d 653, 657 (1989) (citation omitted). *Zagaroli* is analogous here in that, though the easement in that case was much more limited than the Flowage Easement here, the defendants in that case asserted Duke's authority under its FERC license in a similar situation. This Court held that

> [a]lthough a FERC licensee may exercise the power of eminent domain over lands which will make up the bed of a lake associated with a hydroelectric dam, neither Duke Power nor its predecessor in title took the land in question by eminent domain. . . . [T]he Federal Power Act does not give Duke Power the authority to grant defendants the right to use plaintiff's property without the assent of the plaintiff. To hold otherwise would in effect authorize the taking of property without just compensation.

*Id.* at 54, 379 S.E.2d at 657-58 (internal citation omitted).

Put another way and as a court in another jurisdiction held,

> while the FERC license gives [the licensee] the *authority* to regulate certain uses and occupancies of land in the FERC Project Boundary without prior FERC approval, it does not give [the licensee] the *right* to do so. This is because [the licensee] must still have obtained independent control of

land needed to operate and maintain [the] Project. *Tri-Dam v. Keller*, No. 1:11–cv–1304–AWI–SAB, 2013 WL 2474692, at *3 (E.D. Cal. June 7, 2013) (unpublished).

¶ 33 The record here indicates that Duke had the authority and opportunity to seize in fee the property of the Kisers' predecessors through eminent domain but, instead, elected to negotiate an easement with the Kiser Grandparents. In so doing, Duke never acquired fee title to the submerged land and cannot now assert its authority under its FERC license as if it possessed the land in fee simple. As a result, Duke is limited to the uses and exercise of dominion over the Kiser Lake Parcel to those expressly granted in the easements. "[A]n easement holder may not increase his use so as to increase the servitude or increase the burden upon the servient tenement." *Hundley v. Michael,* 105 N.C. App. 432, 435, 413 S.E.2d 296, 298 (1992) (citation omitted). "If the easement holder makes an unwarranted use of the land in excess of the easement rights held, such [use] will constitute an excessive use . . . ." *Hundley*, 105 N.C. App. at 435, 413 S.E.2d at 298 (citing *Hales v. Atlantic Coast Line Railroad Co.,* 172 N.C. 104, 107, 90 S.E. 11, 12 (1916)).

¶ 34 The Federal Power Act does not give Duke Power more rights than those it acquired in the easements. Duke does not have the authority to grant the Third Parties the right to permit others to use the Kisers' property without the assent of the Kisers, because doing so would allow the taking of the Kisers' "property without

just compensation." *Zagaroli,* 94 N.C. App. at 54, 379 S.E.2d at 658.

### 3. *Duke's Inconsistent Permitting Policies*

¶ 35        Next, the Kisers argue that Duke should not be allowed to prohibit the Kisers' maintenance of a structure within the 280.4 acre area, while simultaneously permitting the Third Parties' maintenance of structures within the same. The Kisers contend that this inconsistent treatment demonstrates an apparent discrepancy between Duke's actions and its rights under the easement or, alternatively, that the inconsistent treatment is not equitable. To the contrary, however, this argument is premised upon a misinterpretation of the rights and limitations conveyed in the controlling easement.

¶ 36        As noted above, the Kiser Grandparents granted two separate easements in the same conveyance. In relevant parts, the first easement "convey[ed] unto Duke . . . a permanent easement of . . . the right to clear, and keep clear from said 280.4 acres. . . all . . . structures . . . and . . . to treat said 280.4 acres, more or less, in any manner deemed necessary or desirable by Duke . . . ." The second easement conveyed "unto Duke . . . a permanent flood easement . . . in connection with . . . the construction, operation, maintenance, repair, altering, or replacing of a dam" upon described land adjacent to the aforementioned 280.4 acres. While this second easement utilizes limiting language associated with Duke's operation of a dam, the first easement does not contain such limiting language. Rather, a plain reading of the first easement

reveals that Duke possesses an unrestricted right, among others, to "clear, and keep clear . . . all . . . structures" upon the land. Though its actions upon the 280.4 acres are limited to those seemingly inexhaustive rights enumerated in the easement, Duke is not required to show that its use of the 280.4 acres of land is consistent with a greater purpose. Duke may eliminate interferences with its permanent easement rights to the 280.4 acres, consistent with its easement.

### B. Navigability of Lake Norman

¶ 37        Irrespective of easements and also arguing that the Third Parties have a common-law right to use the waters of Lake Norman above the Kiser's submerged land for recreational activities and to erect and maintain docks and other such structures that provide access from the Third Parties' lots to the waters of Lake Norman, Duke and the Third Parties assert the public trust doctrine and riparian rights respectively.

¶ 38        Exploring the first claim, the public trust doctrine is a common-law principle recognized by statute that provides for the public use of both public and private lands and resources consistent with certain activities such as "the right to navigate, swim, hunt, fish, and enjoy all recreational activities." *Nies v. Town of Emerald Isle*, 244 N.C. App. 81, 88, 780 S.E.2d 187, 194 (2015) (citations omitted); N.C. Gen. Stat. § 1-45.1 (2020). This doctrine applies to navigable waters. *State ex rel. Rohrer v. Credle*, 322 N.C. 522, 527, 369 S.E.2d 825, 828 (1988). When determining whether a body of

water is navigable for the purpose of the public trust doctrine, this State has

historically adopted several tests over nearly 200 years, that include the "ebb and

flow" test, *Wilson v. Forbes*, 13 N.C. 30, 38 (1828), "sea vessel" test, *State v. Glen*, 52

N.C. 321, 333 (1859), and "navigable in fact" test, *State v. Twiford*, 136 N.C. 603, 606,

48 S.E. 586, 588 (1904). Currently, "the test of navigability in fact controls in North

Carolina" and is described as follows:

> " 'If water is navigable for pleasure boating it must be
> regarded as navigable water, though no craft has ever been
> put upon it for the purpose of trade or agriculture. The
> purpose of navigation is not the subject of inquiry, but the
> fact of the capacity of the water for use in navigation.' " . . .
> In other words, if a body of water in its natural condition
> can be navigated by watercraft, it is navigable in fact and,
> therefore, navigable in law, even if it has not been used for
> such purpose.

*Gwathmey v. State of North Carolina*, 342 N.C. 287, 299, 301, 464 S.E.2d 674, 682

(1995) (quoting *Twiford*, 136 N.C. at 608-09, 48 S.E. at 588). This test applies not

only to ocean waters but also to inland rivers and lakes. *State v. Narrows Island

Club*, 100 N.C. 477, 481 (1888).

¶ 39          Consistent with the navigable-in-fact test, the "natural condition" element

espoused in *Gwathmey* "reflects only upon the manner in which the water flows

without diminution or obstruction." *Fish House, Inc. v. Clarke*, 204 N.C. App. 130,

135, 693 S.E.2d 208, 212 (2010). Thus, even artificial or man-made bodies of water

are subject to navigability for the purpose of the public trust doctrine. *Id.* When

evaluating the navigability of an artificial lake, however, our sparce caselaw on the matter further suggests that an artificial lake is not navigable in its natural condition merely because boats can navigate its surface. Indeed, a party must "show that the [feeding waterway of the lake] is passable by watercraft over an extended distance both upstream of, under the surface of, and downstream from the lake." *Bauman v. Woodlake Partners, LLC*, 199 N.C. App. 441, 453, 681 S.E.2d 819, 827 (2009).

¶ 40        Artificial bodies of water may be navigable only when they arise from or are connected to already natural, navigable-in-fact waters. When positing navigability, though, "the mere fact that a dam has been placed across a navigable stream, without more, [does not] suffice[] to render that stream non-navigable." *Id.* at 451, 681 S.E.2d at 826.

¶ 41        Exploring the second claim, riparian rights are likewise the product of our common law. "Riparian rights are vested property rights that . . . arise out of ownership of land bounded or traversed by navigable water." *In re Protest of Mason*, 78 N.C. App. 16, 24-25, 337 S.E.2d 99, 104 (1985) (citation omitted). Irrespective of the ownership of submerged land, riparian owners enjoy "the right of access over an extension of their waterfronts to navigable water, and the right to construct wharfs, piers, or landings." *Pine Knoll Ass'n v. Cardon*, 126 N.C. App. 155, 159, 484 S.E.2d 446, 448 (1997) (quoting *Bond v. Wool*, 107 N.C. 139, 148, 12 S.E. 281, 284 (1890) (alterations omitted)). As with the public trust doctrine, the existence of riparian

rights hinges upon an "identical" navigability test. *Newcomb v. County of Carteret*, 207 N.C. App. 527, 542, 701 S.E.2d 325, 337 (2010). Similarly, then, a riparian owner may possess access rights to an artificial body of water. *Id.*

¶ 42        In the present case, because Duke and the Third Parties assert the public trust doctrine and the existence of riparian rights for the first time on appeal, the trial court was not given the opportunity to hear arguments for or against the navigability of the Catawba River and consequently Lake Norman and made no findings concerning these issues. To determine if a watercourse is navigable-in-law is to consider if it is navigable-in-fact, "[t]he navigability of a watercourse is therefore largely a question of fact," *State v. Baum*, 128 N.C. 600, 604, 38 S.E. 900, 901 (1901), and, thus, is a determination that this Court is prohibited from considering.

¶ 43        This Court may only hear issues of law and is barred from making findings of fact. *Weaver v. Dedmon*, 253 N.C. App. 622, 627, 801 S.E.2d 131, 136 (2017). Rather, a jury is entrusted to review "evidence tending to show that the stream in question is passable by watercraft over an extended distance both upstream of, under the surface of, and downstream from the lake." *Bauman*, 199 N.C. App. at 453, 681 S.E.2d at 827. While a prior opinion of this Court has suggested that the Catawba River may be navigable in its natural state, it has only done so in *dicta. Id.* at 451, 681 S.E.2d at 826 (noting that, by considering dams when making navigability decisions, "many of the major rivers in North Carolina, such as the Catawba and the Yadkin, would

become non-navigable, which would be a troubling result"). "Language in an opinion not necessary to the decision is *obiter dictum*[,] and later decisions are not bound thereby." *Trs. of Rowan Technical Coll. v. J. Hyatt Hammond Assocs.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985) (citations omitted); *see also Washburn v. Washburn*, 234 N.C. 370, 373, 67 S.E.2d 264, 266 (1951). Despite Duke's assertion to the contrary, the record does not show undisputed facts or contentions, which prove the navigability of the Catawba River consistent with the requirements and considerations above. This absence presents a genuine issue of material fact to be further determined.

## III.    Conclusion

We hold the trial court erred in granting summary judgment in favor of Duke and the Third-Parties and in granting use rights to the Third-Parties of the docks and other such structures over and into the Kisers' submerged 280.4 acres upon a cloud-upon-title theory. To hold otherwise would authorize the taking of the Kisers' property without just compensation. For the reasons outlined above, we reverse and remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Judges TYSON and COLLINS concur.